James R. PIERCE

v.

The UNITED STATES of America.

Civ. A. No. 2134.

United States District Court
E. D. Tennessee, S. D.
April 19, 1955.

Van Derveer & Parks, Chattanooga, Tenn., for plaintiff.

John C. Crawford, U. S. Atty., Knoxville, Tenn., for defendant.

DARR, Chief Judge.

This is a suit for damages against the United States under the provisions of the Federal Tort Claims Act, 28 U.S.C.A. §§ 1346, 2671 et seq. for injuries received by the plaintiff while working as an electrical lineman at the Volunteer Ordnance Works (VOW).

The VOW, located near Chattanooga, Tennessee, is a government owned munition plant, built and ultilized during World War II in the manufacture of TNT. At or following cessation of hostilities, it was deactivated and placed in a stand-by status. As a result of the Korean War the Department of the Army decided in 1952 to reactivate VOW and again utilize its facilities for the production of explosives.

On June 30, 1952, the Ordnance Corps contracted with Atlas Powder Company to use the plant to manufacture TNT. Before production could begin, however, certain rehabilitation work was necessary, including work on the aerial electrical distribution system. In June of 1952 the government, through the Corps of Engineers, contracted with Patchen and Zimmerman, architect-engineers, to perform services in the preparation of designs, drawings, etc. for the job. During the same month the Corps of Engineers contracted with Hiwassee Constructors for the actual rehabilitation. In accordance with authority granted in its contract, Hiwassee subcontracted the electrical work to J. A. Lonas, Jr.

After entering upon the work Lonas defaulted. In March of 1953 the surety of Lonas procured the services of Turner Electric Company to come in and complete the contract. The plaintiff was an employee of Turner and was injured on June 14, 1953, while working on the project.

During the morning and early afternoon of the date of the accident plaintiff and other members of his crew had been working on power lines in the so-called North Acid Area of the project. When they finished there they moved into the East Acid Area, which is where the accident occurred.

The work to be done in the East Acid Area consisted of replacing guy wires on a junction pole. To protect the men from the danger of doing the work while the power was on the lines of the junction

pole, it had been decided that they should be killed by pulling the switches which controlled their source of feed located on a nearby substation. Some of the lines of the substation were high-voltage wires, and it had also been decided that the switches would not be pulled until the power on the substation itself had been killed. The practice was to eliminate power over the lines by proper manipulation of switches at the powerhouse. But because power will back up from motors or because there might be a mistake in breaking the current at the powerhouse, the custom is universal to also eliminate the flow of power, interrupting it by the disconnection of switches at substations. In this manner workmen would be safe in replacing guy wires on the junction poles.

According to the proof, when Turner wanted a line killed the procedure was to take the matter up with Hiwassee, who in turn consulted with Atlas so that a time convenient to all could be set, for although Atlas had only a small advance party on the premises, some buildings utilizing electricity were occupied by it. Once the date and time was agreed upon the practice was for the crew foreman doing the work necessitating the cutting of power to pull the necessary switches. The proof also indicates that the pulling of switches was directed or supervised on occasions by Leonard Webb, general foreman for Turner, and R. L. Hughes, electrical superintendent of Hiwassee. In any event the operation was one left entirely to the contractors and was one over which the Corps of Engineers chose to exercise no control.

There was proof that on the morning of the date plaintiff was hurt, R. L. Hughes told plaintiff's crew foreman that the switch would be thrown and that there would be clearance on the lines at five o'clock p. m. It was afternoon when the crew moved into the East Acid Area but before five o'clock. They were instructed by Leonard Webb, the general foreman of Turner, not to begin work on the lines until the clearance had been obtained. As a result they busied themselves with making up guy wires while waiting for the clearance. Webb went away but returned a short time later. He took plaintiff and another lineman, Burnette, with him to a location near the substation where they pulled some switches. After they were pulled Webb left, again telling the men not to go up the poles until he returned. At approximately five o'clock he came back and, according to the plaintiff, told the crew foreman, "Okay, boys she is all dead. You can go ahead and pull them out, boys, they are all safe." Thereupon the crew foreman, Miller, sent plaintiff and Burnette up the substation poles to pull the switches. This testimony on behalf of the plaintiff was uncontradicted by the government.

According to all the testimony "clearance" meant, in the language of electricians, that the power would be entirely off and that the lines would be dead.

Plaintiff went up one pole to pull the switches which could be reached from that vantage point. Burnette went up the adjacent pole. According to plaintiff, Burnette pulled his switches first, using a "hot stick" or insulated pole. He then passed the stick over to plaintiff and the latter pulled three switches from his pole and handed the stick back. Prior to beginning work plaintiff had fastened his safety belt around the pole.

Plaintiff pulled three switches and returned the stick to Burnette. According to his own account, the next thing he did was to take his hammer and rake it down a high-voltage wire or riser which ran parallel to the pole and behind his back. This was done as an additional precautionary measure and constituted the practice in general use among linemen as their own check to determine whether or not lines with which they might come into contact were dead. According to plaintiff, when this was done Burnette stated he thought he saw something. Whereupon the plaintiff raked his hammer down the riser a second time but got no reaction. He then took his gloved hand and slapped the riser. Nothing happened. As one final check he took off

his glove and struck the riser with his bare hand, getting no reaction. Meanwhile Burnette began to make his descent. According to plaintiff he started to pull his right foot up and "unsafety", evidently in preparation to descending, when his right spike "cut out", causing him to be thrown around the pole. Thereafter he remembered nothing until he regained consciousness some hours later at the hospital.

According to the testimony of several witnesses sparks were seen and plaintiff slipped or fell in such a way that his right hand was touching the riser, his left hand was in contact with an "air braker switch handle" located on the pole, and his head was thrown into the upper portion of a guy wire which was attached to the pole just above the level of plaintiff's head.

The whole proof showed that the upper portion of the guy wire was grounded by touching, at its point of connection with the pole, a ground wire which was attached to and ran down the pole to the ground surface. It was this condition which caused plaintiff to be shocked when he touched the riser. As a result of being thus grounded the 4160-voltage current coursed through plaintiff's body causing severe burns to his hands and across the top of his head. The head injury caused concussion and some possible brain damage. There is a permanent scar. The burns to plaintiff's hands ultimately necessitated their amputation, together with the lower portion of both arms approximately midway between the wrists and elbows.

Burnette, who was only part way down his pole, came back up and with the use of the hot stick pushed plaintiff's body off the riser where he was held until two other linemen succeeded in getting him down.

The construction and maintenance of the substation has an important bearing on the case. The wiring and switches referred to were located above ground on the supported area afforded by four power poles forming a square or rectangular structure. Although the guy wire had an insulator in its upper portion to prevent the lower part of it from becoming charged with current, where it was attached to the pole it was permitted to be in contact with the pole ground wire, thereby causing that part of it from the insulator to the pole to be grounded. The air braker switch handle was connected with or part of a metal pipe which ran down the side of the pole, but the proof does not establish with certainty whether or not it was also grounded.

According to the proof, it was due to the defective makeup of the substation whereby the guy wire was grounded which caused plaintiff to be shocked when he came into simultaneous contact with it and the riser. Also uncontradicted was plaintiff's explanation as to why he went up the side of the pole nearest the riser. He testified that to have gone up the other side would have necessitated straddling a metal pipe which was located there and ran parallel to the pole, at a sufficient distance from it as to make it impossible to reach the pole with hands and feet in a manner to assure safe climbing. It was also shown that the switches which he pulled were so constructed as to require a straight pull which could not have been accomplished from an angle.

Robert T. Hine, Electrical Supervising Engineer for Patchen and Zimmerman, examined the substation shortly after the accident. He was called as a witness for the plaintiff and testified that in his opinion the construction and maintenance of the substation so as to allow the upper portion of the guy wire to be grounded by contact with the ground wire created a dangerous condition especially since it was located in the area in which work would have to be done. He also stated that a simple wood insulator in use in the trade could have been used at the point where the guy wire was connected to the pole so as to have effectively insulated it from any contact with the ground wire.

The riser in question was located only fifteen inches from the pole. Mr. Hine

stated that in his opinion the location of the riser in such close proximity to the pole created a definite hazard for workmen.

The pertinent provisions of the National Electrical Safety Code, National Bureau of Standards Handbook H–30, concerning clearances was introduced in evidence. It indicated that supply conductors of the voltage of this riser should afford at least thirty inches climbing and working space.

The electrical current furnished for VOW was purchased by the government and delivered to it at the site of VOW, where it was fed into the project over government owned power lines existing on the premises. The government, through the Ordnance Corps and the Corps of Engineers, had possession of the premises.

The Corps of Engineers had a contracting officer at the site whose duties included keeping track of the work, settling disputes and, in general, seeing that the work required by the government was being satisfactorily performed.

It is plaintiff's contention that the government, in furnishing power for the premises, was dealing with a highly dangerous substance and, under Tennessee law, owed a duty to all persons rightfully on the premises to exercise due care for their safety commensurate with the danger involved. Further that the government knew or should have known that possible injuries might result from such electricity unless adequate precautions were taken to protect the workmen on the power lines from its dangerous propensities. Plaintiff asserts that the government failed to take such precautions and that his injuries resulted from its negligence in failing to do so. Indeed it is asserted that electricity is an imminently dangerous substance and that, under Tennessee law, the government had a nondelegable duty to take adequate precautions to safeguard the workers on the project.

In opposition the government has set up certain defenses: (1) That plaintiff's right to recovery is barred by his receipt of benefits under the Tennessee Workmen's Compensation Statute, T.C.A. § 50–901 et seq.; (2) that plaintiff assumed the risks incident to his work; (3) that he was guilty of contributory negligence; (4) that his injuries were caused by a fellow servant which bars recovery; (5) that the companies charged with the rehabilitation work were independent contractors for whose negligent acts or omissions the government is not liable; (6) that it was the negligence of plaintiff's foremen (employee of independent contractor) in leading plaintiff to believe the power was off that was the proximate cause of the accident rather than negligence on the part of any employee of the government; (7) that defendant's agents and employees were executing a regulation of the Department of the Army and therefore the case falls within the exclusion of 28 U.S.C.A. § 2680(a); (8) that under the same section the court has no jurisdiction because defendant's agents and employees were performing a discretionary function; (9) that plaintiff has failed to show that any agent or employee of the government was negligent; and (10) assuming the electricity to be an inherently dangerous substance, no absolute liability rests upon the government.

Although substantial questions are raised, under the evidence plaintiff has clearly established his right to recover.

Section 1346(b), 28 U.S.C.A., provides that liability shall attach "under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." Therefore, the substantive law of Tennessee must govern.

The plaintiff is not barred from recovery by his receipt of benefits under the Tennessee Workmen's Compensation Statute. The applicable Code section, as modified in 1949, expressly provides that an injured workman may take compensation under the Act and also sue for recovery against a third party re-

sponsible for his injury, the only pertinent limitation being that in the event of a recovery the employer shall be entitled to be subrogated to or have a lien against such recovery to the extent of his payments to the injured workman. Williams Tennessee Code, section 6865, T.C.A. § 50–914.

■ Defendant is placed in no better position by virtue of the provisions of the following section, 6866, T.C.A. § 50–915, for it has no application to third parties, but is limited to principal, intermediate, or subcontractors of the injured employee. Adams v. Hercules Powder Co., 180 Tenn. 340, 175 S.W.2d 319, 151 A.L.R. 1352.

■ Neither does the evidence show that plaintiff assumed the risks created by the conditions responsible for his injury. For that reason it will not be necessary to discuss plaintiff's answering contention that the doctrine applies only as between employer and employee. Even though a worker may be held to assume the normal and foreseeable risks incident to the type work in which he is engaged, he has the right to assume that his employer has used due diligence to provide suitable appliances in the operation of his business, and he does not assume the risk of the employer's negligence in performing such duties, subject, of course, to the exception that where a defect is known to the employee or is patent so as to be readily observed by him through reasonable diligence for his own safety, he may be held to assume the risks incident thereto. Choctaw, Oklahoma & G. R. Co. v. McDade, 191 U.S. 64, 68, 24 S.Ct. 24, 48 L.Ed. 96. The term not only presupposes some danger but a reasonable opportunity to ascertain the nature of the risk and an appreciation of that risk. 7 C.J.S., Assumption (Assumption of Risk), p. 137.

■ As was said in Moon v. City of Chattanooga, 10 Tenn.App. 82, 86, citing, Tennessee Coal, Iron & R. Co. v. Jarrett, 111 Tenn. 565, 82 S.W. 224; Knoxville Iron Co. v. Pace, 101 Tenn. 476, 48 S.W. 232; Whitelaw v. Memphis & C. R. Co., 84 Tenn. 391, 1 S.W. 37: "* * * if the employer knows the servant will be exposed to risk and danger in any labor to which he assigns him and is aware that the servant is, from any cause, disqualified to know, appreciate and avoid such dangers, the dangers not being obvious, the master is guilty of a breach of duty unless he cautions and instructs the servant, as would reasonably enable the servant to exercise due care and do his work in safety to himself."

The defective condition and risk must have been sufficiently obvious and the employee's relation thereto sufficiently close to enable him to have been aware of them. Cincinnati, N. O. & T. P. Ry. Co. v. Thompson, 6 Cir., 236 F. 1.

The existence of power in this riser was not patent. Neither could its "live" condition be readily ascertained by the plaintiff. He heard his general foreman, who had apparently undertaken to see that it was killed, tell his own foreman that it was clear and that they could go up and pull the switches. Acting upon the belief held by everyone present, including the foreman, that the power on the substation had been cut off, the plaintiff ascended the pole to pull the switches. Even though he had been led to believe the lines were dead he tested the riser in the manner in general use among linemen. This was done as an additional precaution. Not until after all of this had transpired was plaintiff injured.

Of course, plaintiff was charged with knowledge of the close location of the riser to the pole. Its proximity was an obvious condition which he must have seen. However, it must be remembered that had the power been off as plaintiff had reasonably been led to believe, its closeness would have involved no danger.

As for the guy wire, even if plaintiff be charged with knowledge that it was grounded, there is no occasion for applying the doctrine of assumption of risk, for again that condition would have held no danger had the power been off.

Simply put, the presence of power on the substation was a latent danger, one which plaintiff had been led to believe by responsible superiors did not exist. And, as his testing of the riser demonstrates, it was a condition not readily discoverable by reasonable diligence upon his part. Under the circumstances there is no evidence to support a finding of assumption of risk, either actual or constructive.

The proof also negates the government's contention that plaintiff was guilty of contributory negligence. However, the Court does feel called upon to comment upon certain aspects of the proof which were dealt with at some length on cross-examination in an attempt to show plaintiff was negligent.

Several witnesses testified that, because of their location, the switches which plaintiff pulled could not have been manipulated from the adjacent pole, even by use of a hot stick. Neither was a hot stick available of sufficient length to have pulled them from the ground. The government also attempted to show plaintiff was negligent in ascending the pole on the side next to the riser. However, as previously noted plaintiff's uncontradicted testimony was that it was not feasible due to the metal pipe located on that side, which made safe climbing impossible.

Neither did the government succeed in showing negligence was involved in the manner in which plaintiff's spike slipped. His particular spikes were shown to be of the type in general use, and all of the proof on the point tended to show that spikes do slip or "cut out" on occasion regardless of how carefully used.

Of course no lineman is justified, or in law may, presume his place of work is safe. Therefore, the plaintiff might well be held guilty of negligence if the facts had shown he performed his work in a careless manner in reliance upon the belief that the lines were dead. This would be so despite the fact that such belief had been fostered by a superior.

On the contrary, however, the evidence reveals that plaintiff exercised due care and even went so far as to test the riser for signs of danger. To hold him guilty of contributory negligence would be to predicate negligence upon the fact that he sustained injury.

According to the rules of evidence followed by the federal courts as well as the courts of this state, unless the facts establishing contributory negligence appear from plaintiff's proof, the burden of proving it as a defense is upon the defendant asserting it. Burke v. Citizens' Street Railway Co., 102 Tenn. 409, 52 S.W. 170; Highland Coal & Lumber Co. v. Cravens, 8 Tenn.App. 419; Winn v. Consolidated Coach Corporation, 6 Cir., 65 F.2d 256. The government elicited no proof on cross-examination which showed plaintiff was negligent and introduced no independent proof on the issue. Therefore, its defense on that basis cannot be sustained.

The government also argues that plaintiff cannot recover because his injuries were caused, if at all, by the negligence of (a) an independent contractor, or (b) a fellow servant, one or both.

It is true that an employer is not generally liable for the negligence of an independent contractor. However, there is an exception in those cases where, from the nature of the particular work or project, in the natural course of events mischievous consequences can be expected to arise unless means are adopted to prevent it. In such cases the owner-employer is held to be under a non-delegable duty to see that appropriate preventative measures are adopted.

This enlightened rule has been recognized and given application by the Tennessee courts. Davis v. Cam-Wyman Lumber Co., 126 Tenn. 576, 150 S.W. 545; International Harvester Co. v. Sartain, 32 Tenn.App. 425, 222 S.W.2d 854, certiorari denied by Supreme Court, March 11, 1949.

Electricity has traditionally been considered extremely dangerous and the duty of exercising a high degree

of care is placed upon those dealing with it. Walpole v. Tennessee Light & Power Co., 19 Tenn.App. 352, 89 S.W.2d 174; Tennessee Electric Power Co. v. Sims, 21 Tenn.App. 233, 108 S.W.2d 801. In fact the effect of the pronouncements in the Sartain case, supra, is to hold it an imminently dangerous agency which places upon the individual dealing with it, a nondelegable duty to see that reasonable means are taken to protect those who come into contact with it. Failure to fulfill that duty results in liability on the part of such individual, even though the plaintiff's injury resulted in whole or in part from the acts or omissions of an independent contractor employed to perform the particular work.

 The government was in possession of the premises through its agencies, the Corps of Ordnance and Engineers. Indeed counsel conceded during the trial that the power lines and substation involved had not been turned over to Atlas. The government had contracted with the Electric Power Board of Chattanooga to furnish power for the premises. The power was delivered by the utility to the site of VOW and brought onto the premises over government owned lines. The government thereupon became a supplier of electricity, subject to the same high degree of care to protect persons properly upon the premises as is required of electric power companies. International Harvester Co. v. Sartain, supra.

The evidence conclusively shows that adequate safeguards were not taken. According to the testimony of Robert Ingersoll, representative of contracting officer on the premises, the Corps of Ordnance and Engineers had at their disposal, even before the rehabilitation work was commenced, the detailed plans and specifications showing the makeup of all wiring and substations, including the one in question. Further that an inspection of those plans would undoubtedly have disclosed the dangerous condition created by the riser being located in such close proximity to the pole.

Although much of the inspection work had been delegated by contract to Patchen and Zimmerman, it also appears that the Corps of Engineers had some inspectors in the field who were to see that the electrical work was progressing satisfactorily. And of course by virtue of its own contracts, the government knew that the work to be done would necessitate linemen being in and about both the lines and substations of VOW. It also knew that, unless proper steps were taken to see it was killed, high-voltage power would be on those lines and substations while the work progressed.

Despite these facts the government took absolutely no steps either to correct the defects in the substation or, failing that, to see that the power was off while the crew of linemen to which plaintiff belonged performed their work upon it.

 In the first instance the government was guilty of negligence in erecting and maintaining the substation in a condition hazardous to workmen. Under the nondelegable duty placed upon it it was also chargeable with the negligence of its independent contractor in failing to kill the power before sending plaintiff upon the pole.

The obvious effect of the Sartain decision is to likewise render inefficacious the government's contention that plaintiff is barred recovery because his injuries were caused by the negligence of a fellow servant. To rule otherwise would be to ignore the plain meaning of the opinion and emasculate the theory of nondelegable duty which it announced.

 This interpretation is in conformity with the opinion expressed by the text writers on the extent and applicability of the fellow servant doctrine. As stated in 56 C.J.S., Master and Servant, § 322: "The fellow-servant rule is not involved where the act complained of is that of the master and not that of a fellow servant, nor does it apply * * * where the proximate cause of the injury is the default of the master in respect of a primary or nondelegable

duty." Assuming, without deciding, that the doctrine can be relied upon by one not the employer of the injured party as is the case here with the government, the duty being nondelegable, any act or omission of a fellow employee cannot be relied upon to isolate the one upon which the nondelegable duty rested.

Although this is dispositive of the question, there is serious doubt that the rule would apply in any event for the simple reason that the doctrine, as its name implies, requires that the negligent employee be the fellow employee of the injured party. Here the person who purported to see that the power was killed and who erroneously advised plaintiff's own foreman and crew that such was the case, was Leonard Webb, the general foreman of Turner.

■ Neither is there any doubt that the acts and omissions for which the government was responsible were the proximate cause of the accident. Proximate cause has been defined as, " '* * * that act or omission which immediately causes or fails to prevent the injury; an act or omission occurring or concurring with another, which, had it not happened, the injury would not have been inflicted.' " Fairbanks, Morse & Co. v. Gambill, 142 Tenn. 633, 643, 222 S.W. 5, 8. Proximate cause is not necessarily that which is next or last in point of time or place, but rather that which is the procuring, efficient and predominate cause. Grigsby & Co. v. Bratton, 128 Tenn. 597, 163 S.W. 804.

The government was responsible for the condition of the substation and, under the Tennessee decisions, for failing to see that adequate precautions were taken to protect the plaintiff from the high-voltage power which it purchased and placed there. In the face of such evidence the government's contention cannot be sustained.

The government also relies upon the exceptions from tort liability found in 28 U.S.C.A. § 2680(a), which provides:

"The provisions of this chapter and section 1346(b) of this title shall not apply to—

"(a) Any claim based upon an act or omission of an employee of the Government, exercising due care, in the execution of a statute or regulation, whether or not such statute or regulation be valid, or based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused."

Because of the circumstances giving rise to the Presidential Proclamation of December 16, 1950, No. 2914, 50 U.S. C.A. Appendix note preceding section 1, whereby a national emergency was declared to exist, the Department of Army decided in June of 1952 to reactivate VOW. Counsel for the government contends that, therefore, the acts or omissions which plaintiff claims caused his injury were within the mentioned exclusions. In support of its argument the government relies heavily upon the recent decision in Dalehite v. United States, 346 U.S. 15, 73 S.Ct. 956, 97 L. Ed. 1427.

That was a test case representative of many suits growing out of the Texas City disaster. A shipment of ammonium nitrate fertilizer produced by contractors of the government for export to war-ravaged countries exploded in the harbor. The plaintiffs claimed the explosion resulted from the government's negligence, generally stated, (1) in drafting and adopting the fertilizer export program, (2) in committing specific acts of negligence in various phases of the manufacturing process, and (3) official dereliction of duty in failing to police the shipboard loading. The Court held the suit barred under the discretionary function provisions of section 2680(a).

In discussing the term the Court stated at pages 35–36 of the opinion in 346

U.S., at page 968 of 73 S.Ct.: "It is enough to hold, as we do, that the 'discretionary function or duty' that cannot form a basis for suit under the Tort Claims Act includes more than the initiation of programs and activities. It also includes determinations made by executives or administrators in establishing plans, specifications or schedules of operations. Where there is room for policy judgment and decision there is discretion. It necessarily follows that acts of subordinates in carrying out the operations of government *in accordance with official directions* cannot be actionable. If it were not so, the protection of § 2680(a) would fail at the time it would be needed, that is, when a subordinate performs or fails to perform a causal step, *each action or nonaction being directed by the superior,* exercising, perhaps abusing, discretion." (Emphasis supplied.)

It is also important to note that in holding the negligence alleged excluded from actionability the Court stated at page 42 of the opinion in 346 U.S., at page 971 of 73 S.Ct.: "The decisions held culpable were all responsibly made at a planning rather than operational level and involved considerations more or less important to the practicability of the Government's fertilizer program."

Herein the government contends that any acts or omissions involved in failing to take adequate precautions to prevent injuries from its electrical current fell within the discretionary exclusion of section 2680(a). As the summary of facts and quotations from Dalehite opinion demonstrates, the present case is clearly distinguishable. The initial decision to construct VOW and the decision to reactivate surely involved an exercise of discretion for which no liability attaches. Also the decision to undertake the reactivation work at the particular time it was commenced and similar decisions going to the over-all success of the project would necessarily involve decisions at high level in which the exercise of discretion in the choice of various alternative courses of action would be involved. Even the decision to construct electrical substations and bring high-voltage power onto the premises would constitute discretionary functions. However, the Court is unable to go further and say that once the discretion was exercised to construct substations, any discretion was involved in the subsequent negligent construction and maintenance of this substation, or in the failure to warn workmen of its dangerous condition when the rehabilitation program was commenced involving, as it did, the use of high-voltage power. Neither can any exercise of discretion be seen in the failure to take adequate precaution to see that this high-voltage power was not turned loose on such defective structure.

■ Once the decision was made to construct substations and bring in power, all of the discretion required had already been exercised. Therefore, it became the duty of the government and its agents and employees to exercise due care in carrying out the program decided upon. The complete failure to do so is outside the protection afforded the discretionary functions already exercised and results in liability on the part of the government. Such is the holding of a distinct line of cases by our federal courts. In Somerset Seafood Co. v. United States, 4 Cir., 193 F.2d 631, 635, plaintiff sought damages for the loss of its boat occasioned by the government's negligence in creating and marking a wrecked vessel on which it stranded. In reversing the District Court's action in dismissing the complaint, the Court of Appeals had this to say: "In addition to this, we think that, even if the decision to mark or remove the wreck be regarded as discretionary, there is liability for negligence in marking after the discretion has been exercised and the decision to mark has been made. There is certainly no discretion to mark a wreck in such way as to constitute a trap for the ignorant or unwary rather than a warning of danger."

And in Dishman v. United States, D.C., 93 F.Supp. 567, it was held that "discretionary function" exclusion had no application to a case where a Veterans Administration doctor negligently poured carbolic acid into the ear of a patient he was treating. The Court stated at page 571 of the opinion: "This is not a case in which in the exercise of discretion or judgment the officials of the Veterans Hospital declined to give the plaintiff treatment, but it is a case where having exercised their discretion to give the treatment, in accordance with the applicable regulations, the treatment given was negligent." A similar holding was made by the Court of Appeals, Tenth Circuit, in United States v. Gray, 199 F.2d 239.

Hernandez v. United States, D.C., 112 F.Supp. 369, is another case which follows this rule. There plaintiff sued for injuries sustained when the motorcycle on which he was riding was forced to leave the road, which was under the exclusive control of the United States and open to public use, to avoid hitting a road block placed on the road near a United States airfield. At page 370 of the opinion, in holding the "discretionary function" inapplicable, the Court said: "Although exception (a) of Section 2680 clearly includes the performance of a discretionary function or duty, the above authorities have judicially construed the statute to exclude from this exception negligent performance after discretion has been exercised. What the 'discretionary function' exception really means is not crystal clear. The six circuit judges sitting in the Texas City disaster cases were not in agreement. In re Texas City Disaster Litigation, 5 Cir., 1952, 197 F.2d 771, certiorari granted Dalehite v. United States, 1952, 344 U.S. 873, 73 S.Ct. 166 [97 L.Ed. 676]. Until a definitive construction of exception (a) issues from the Supreme Court, this Court is persuaded by the pronouncements of Judges Dobie and Chesnut." See also Worley v. United States, D.C., 119 F.Supp. 719; State of Maryland, for Use of Pumphrey v. Manor Real Estate & Trust Co., 4 Cir., 176 F.2d 414.

These cases all arose prior to the decision of the Supreme Court in Dalehite. However, that decision contains nothing which overrules their interpretation of 2680(a). In Dalehite the Court was careful to point out that the categories of negligent acts relied upon were all responsibly made at a planning rather than operational level and involved considerations more or less important to the practicability of the government's fertilizer program.

The situation in Dalehite does not exist here. No governmental employee or agency at the planning level, or at any other level, made the decision to construct a defective substation, or having been so constructed, to permit it to remain in that condition. Nor was it shown that any such official decided that high-voltage power should be permitted to flow upon the defective structure while workmen were upon it. And certainly the government would not contend that use of the substation in its defective state or the flow of current over its wires during the short time the workmen were required to be upon it was a matter going to the success or practicability of the rehabilitation program.

The Court need not rely upon its opinion alone that the Dalehite case did not revoke the construction of the "discretionary function" exclusion enunciated in the above decisions. Cases decided by the lower courts since Dalehite take a similar view and have continued to recognize the validity of their reasoning considered in the light of Dalehite. Smith v. United States, D.C., 116 F.Supp. 801; Bevilacqua v. United States, D.C., 122 F.Supp. 493; Pennsylvania R. Co. v. United States, D.C., 124 F.Supp. 52; United States v. White, 9 Cir., 211 F.2d 79.

The discussion contained in United States v. White of the duty imposed upon the government as a landowner in such cases is particularly appropriate. In that case a civilian employee sued the

United States after an unexploded projectile went off causing him injury while he was gathering scrap metal under a contract between his employer and the government. In determining that the Dalehite case construing the "discretionary function" exclusion did not preclude recovery the Court said at page 82 of the opinion: "It is claimed that this exception from governmental liability under the Tort Claims Act controls the case before us. We think otherwise. As we understand the philosophy of the holding in Dalehite v. United States, 346 U.S. 15, 73 S.Ct. 956, 97 L. Ed. 1427, the broad scope there given the term 'discretionary function' would not in any event carry us beyond negligence predicated on the departmental rejection, on the score of expense, of Captain Jones' recommendation that the Camp Beale firing ranges be dedudded. We assume, without deciding, that the decision not to undertake the removal of hidden dangers constituted the exercise of a discretionary function of which an invitee such as White was not entitled to take advantage. But the government's failure as a landowner to warn White, a business invitee, of the known danger he was likely to encounter, or to inform him of the findings made by Captain Jones' survey, or of the fact that recommended dedudding methods had not been employed, could not rationally be deemed the exercise of a discretionary function."

So here the government-landowner was equally charged with knowledge that a dangerous condition existed on its premises, one likely to cause serious injury to workers on the project, and it failed to take any steps to warn the plaintiff thereof. Certainly such failure is far removed from that category of acts contemplated by the statute and recognized in the Dalehite case.

 The government's failure, through its agent, the Corps of Engineers, to exercise due care in the premises, is likewise fatal to the argument that it is relieved of liability because engaged in the execution of a statute or regulation in carrying out the rehabilitation program. As section 2680(a) expressly states, exemption from liability in such cases is predicated upon the exercise of due care.

 Neither can the Court accept the government's contention that plaintiff is barred from recovery because he has failed to show negligence on the part of any employee of the government. The premises were under the control of the government. Under its contracts with the companies doing the rehabilitation work, the contracting officer of the Corps of Engineers had the right to approve the work, settle disputes, authorize changes, etc. The dangerous structure was on government premises and the power was purchased and transmitted by the government to be utilized on the premises.

The government can function only through its agents and employees. The plaintiff has shown to the Court's satisfaction that the representatives of the government in possession of VOW totally failed in their duty to safeguard plaintiff from injury as it was their duty to do under Tennessee law. Under the circumstances it is immaterial that plaintiff did not establish the particular named official who was responsible for such duties. The Court knows of no case holding it a prerequisite to recovery that one injured through the negligence of a government employee must show the identity of such individual, so long as the duty and breach thereof is established.

Lastly it is argued that even though the substation may have been defective and high-voltage electricity considered an imminently dangerous agency, no liability rests upon the government solely because of its ownership of the premises. Certainly the Act and the cases dealing with it would seem to require some negligent act before liability attaches. For the purposes of this decision the Court assumes that such is the requirement of the law. But this is of no benefit to the government.

 As the doctrine of nondelegable duty is applied in this state it is not a rule of strict liability regardless of fault. Negligence is required, the sole effect of the doctrine being to preclude the owner-employer from escaping liability for negligence which was a proximate cause of injury on the ground that others may have been guilty of negligence, which was also a proximate cause of injury. As in any other case the basis of liability is negligence. This was made perfectly clear in the Sartain case, supra, where the Court pointed out [32 Tenn.App. 425, 222 S.W.2d 866] that the rule "is one requiring ordinary care under the circumstances, which may be a high degree of care actually, but is not a rule of absolute liability regardless of the exercise of ordinary care, so to make the owner an insurer * * *". Therefore, if the Act requires negligence, the Tennessee cases are in complete conformity with the requirement, liability being imposed upon proof of failure to exercise due care.

The extent of the award to the plaintiff presents a difficult question.

 The observation is made that this plaintiff was the most valiant litigant who has appeared before this Court. While he had lost both hands, he had procured the best artificial substitutes presently known and wore them in court. These were one hook to each hand, manipulated from the shoulder. When asked to show the Court his arms by taking off his shirt, the plaintiff himself unbuttoned his shirt, put it back on and buttoned it. He said there were many things he could do and would do. His attitude was one of determination and courage and excited the admiration of the Court.

A number of cases have been reviewed and a general formula has been worked out by the Court which seems to be rather well in line with the judgments awarded in such cases. Allowing for all the elements to which the plaintiff is entitled, the judgment will be for the plaintiff and against the defendant in the amount of $53,984.81 and costs.

The amount paid to the plaintiff by his employer, under the Tennessee Workmen's Compensation Law, will be adjusted.

This opinion will serve as the findings of fact and conclusions of law.