Zoe P. KUHNE, Executrix of the Estate of Lawrence J. Kuhne,

v.

UNITED STATES of America.

Civ. A. No. 5317.

United States District Court
E. D. Tennessee, N. D.

March 27, 1967.

**650**

Bernard E. Bernstein, Knoxville, Tenn., for plaintiff.

J. H. Reddy, U. S. Atty., Chattanooga, Tenn., G. Wilson Horde, Asst. U. S. Atty., Knoxville, Tenn., K. D. McCasland, Attorney, Office of Chief Counsel, Atomic Energy Commission, Oak Ridge, Tenn., for defendant.

## MEMORANDUM

ROBERT L. TAYLOR, District Judge.

This case was filed under the Federal Tort Claims Act, Title 28 U.S.C. Sec. 2674,[1] to recover $500,000.00 damages for injuries and death to plaintiff's husband, Lawrence J. Kuhne, allegedly caused by the negligence of the Government while decedent was working for the Tennessee Eastman Corporation at Oak Ridge, Tennessee. Jurisdiction is derived from Title 28 U.S.C. Section 1346.

Plaintiff claims that her husband was exposed to radioactive materials during the course of his employment; that this exposure was caused by the failure of the Government to provide proper safeguards to him as an employee and others similarly situated; that the Government was negligent in failing to require plaintiff's decedent to wear protective clothing or protective devices which would have indicated to the decedent the presence of dangerous radioactive material; that it was negligent in establishing the project, the processes and procedures that were employed by the Tennessee Eastman Corporation in the production of nuclear materials during the years from 1943 through 1945; that the Government had superior knowledge of the hazards that were inherent in that kind of activity and failed to properly advise plaintiff's decedent and others similarly situated of the extreme hazards that were present; that it had over-all ownership and control of the process, the materials and the end products and failed to properly procure adequate safeguards of the process and

---

1. "The United States shall be liable, respecting the provisions of this title relating to tort claims, in the same manner and to the same extent as a private individual under like circumstances * * *."

for the handling of the material; that it failed to provide proper monitoring devices during the course of the operation; that it created hazards and the risks that were attendant to its objective of using radioactive materials to achieve a nuclear bomb; that on account of this negligence, plaintiff's decedent ingested radioactive materials that affected various organs in his body which ultimately caused the disease of myelofibrosis with myeloid metaplasia which resulted in his death on October 9, 1965. (Myelofibrosis is a disease which attacks the bone marrow, reducing and ultimately terminating its production of red blood cells and finally causing the marrow to become fibrous and spongy. During the course of the disease the cell-making function is supplemented on a temporary basis by the spleen and liver.)

Plaintiff's decedent had no knowledge concerning the danger which was present in his employment and the materials that were being handled.

A threshold defense of the two-year statute of limitations provided for in the Federal Tort Claims Act[2] was made and decided against the Government on December 6, 1965. Kuhne v. United States, D.C., 250 F.Supp. 523.

The complaint was filed on June 5, 1965. The decedent worked for the Tennessee Eastman Corporation at Oak Ridge from August 26, 1943 to October 12, 1945. The statute of limitations question was recently considered by this Court in the case of Kington v. United States, 265 F.Supp. 699, decided February 21, 1967. It was held in that case that the time when the statute begins to run is determined by Federal law instead of state law. See Foote v. Public Housing Commissioner of United States, D.C., 107 F.Supp. 270; Quinton v. United States, 5 Cir., 304 F.2d 234; Hungerford v. United States, 9 Cir., 307 F.2d 99; Kossick v. United States, 2 Cir., 330 F.2d 933, 7 A.L.R.3d 726.

A contrary view was expressed in the case of Tessier v. United States, 269 F.2d 305 (C.A. 1).

A cause of action does not accrue under Federal law until the injury is discovered or by the exercise of ordinary care should have been discovered, or until the person harmed discovered or should have discovered that his legal rights have been invaded. Urie v. Thompson, 337 U.S. 163, 69 S.Ct. 1018, 93 L.Ed. 1282; Quinton v. United States, supra.

In 1958 or 1959, when decedent began to lose weight and feel tired, he consulted with Dr. Kaufman of Brooklyn, New York. He was placed in Prospect Heights Hospital by Dr. Kaufman and it was discovered that he had an anemic condition. Dr. Kaufman was not prepared to treat him for that condition and referred him to Dr. Lee, a noted hematologist of Brooklyn, New York, about May 27, 1960. Dr. Lee diagnosed his condition as myelofibrosis with myeloid metaplasia and advised decedent of the diagnosis. Dr. Lee was told by the decedent that he had worked at Oak Ridge where radioactive materials were processed and asked if there was any relation between his disease and his work. Dr. Lee told him in his opinion there was not. But in May, 1965, Dr. Lee read an article that was published in January, 1964 by Dr. Robert E. Anderson and two Japanese doctors which dealt with generalized myelofibrosis with myeloid metaplasia in relation to those who were exposed by the dropping of the bomb on Hiroshima, which caused him to reconsider the question and to advise decedent that there was a possibility that his exposure to radioactive materials at Oak Ridge caused his disease. This was the first time the decedent obtained such information or by the exercise of ordinary care should have obtained it. Plaintiff's decedent filed suit within a month after receipt of the information from Dr. Lee.

2. "A tort claim against the United States shall be forever barred unless action is begun within two years after such claim accrues * * *." (28 U.S.C. § 2401 (b).)

■ Decedent did not know and could not have discovered by the exercise of ordinary care that his legal rights had been invaded prior to the time Dr. Lee told him that his condition may have been related to his Oak Ridge work.

Plaintiff's suit is not barred by the two-year statute of limitations.

■ It is further contended that plaintiff's suit is barred by laches. This contention is based upon the assertion that the claim was not asserted until twenty years after the alleged negligence and five years following the diagnosis of the disease.

The fact that the negligence of the Government allegedly occurred in 1945 does not make out a case of laches against the plaintiff and her decedent. What has heretofore been said in the discussion of the statute of limitations is applicable to the asserted defense of laches. Plaintiff's decedent did not unduly delay the institution of suit after he ascertained that his alleged legal rights had been invaded and such suit is not barred by laches.

The discretionary function contained in the Federal Tort Claims Act is also plead as a defense. 28 U.S.C. § 2680(a).[3]

■ The establishment of the project at Oak Ridge involved planning and discretion. Under the wording of the exemption the Government could not be held liable for damages to a third party occurring from the planning of the project unless it abused its discretion. However, at the time plaintiff's decedent worked at Oak Ridge, the project had gotten far beyond the planning level. It was in full-scale operation and producing enriched uranium that was used in the atomic bombs that were dropped on Nagasaki and Hiroshima.

■ Negligence of Government agents occurring during the operational stage,

which resulted in injury to employees would make the Government liable. Indian Towing Co. v. United States, 350 U.S. 61, 76 S.Ct. 122, 100 L.Ed. 48; Rayonier, Inc. v. United States, 352 U.S. 315, 77 S.Ct. 374, 1 L.Ed.2d 354; Pierce v. United States, D.C., 142 F.Supp. 721.

■ The Government also claims that it is exempt from liability under Section 2680(j) of the Act, which provides that the Act shall not apply to "Any claim arising out of the combatant activities of the military or naval forces, or the Coast Guard, * * *."

Plaintiff's decedent was not a soldier. He was an electrical engineer who worked in a civilian capacity at Oak Ridge. His claim was in no way connected with the "military or naval forces." He was not engaged in "combatant activities." Johnson v. United States, 9 Cir., 170 F.2d 767.

The Government further contends that there is no causal connection between the disease suffered by plaintiff's decedent and his work for the Tennessee Eastman Corporation at Oak Ridge. This is one defense going to the merits of the case and requires an examination of the evidence.

Decedent's duties were connected with the construction and installation of equipment in Buildings 9201–1, 9201–2 and 9201–3 until such buildings were completed. Thereafter, in the summer or fall of 1944, following the completion of Building 9201–3, decedent became one of the shift supervisors in the Alpha production process operation carried on in this building and continued in such employment until terminated in October, 1945.

Tennessee Eastman Corporation as a cost-plus-fixed-fee contractor with the Government as represented by the U.S. Corps of Engineers, Manhattan Engineering District, for the operation and maintenance of the Government-owned

---

**3.** "The provisions of this chapter and section 1346(b) of this title shall not apply to—

"(a) Any claim based upon an act or omission of an employee of the Government, exercising due care, in the execution of a statute or regulation, whether or not such statute or regulation be valid, or based upon the exercise or performance or the failure to exercise or perform a * * * discretion involved be abused."

Y–12 electromagnetic facility at Oak Ridge. This project was a part of the nation's military effort in World War II to harness the energy of the atom for the development and production of an atomic weapon or bomb in the national defense.

The electromagnetic process involved an effort to separate the isotope uranium 235 from uranium 238 under a chemical and electrical theory for the use of heat to change uranium tetrachloride to a gaseous form, subjecting the ions or atoms of the gas to a high voltage electrical charge to ionize the atoms under a high vacuum condition in a tightly sealed unit or container, and separating the U–235 from the U–238 by virtue of a difference in the arc of the ions or isotopes in a high magnetic field based upon the difference in atomic weight between U–235 and U–238. The item of equipment used in the process was known as a calutron, which weighed many tons and was fixed in place and incorporated a "charge bottle" unit and a "receiver box" unit, which units were removable from the calutron. The charge bottle was filled, sealed and placed in the charge bottle unit as a part of the function of the chemical phase of the electromagnetic operation in an area physically removed and separated from decedent's work area, and the entire charge bottle unit was transported to the calutron unit and placed therein. When the charge bottle unit had been placed in the calutron unit and securely bolted in place, an extremely high vacuum was pulled on the calutron unit prior to commencement of the separation process, such high vacuum being necessary to prevent any arcing of the high electrical voltages used when the process was commenced.

The normal run of an Alpha process calutron involved some 14 to 18 days— many runs were much less and some as short as a day—and at the completion of the run the receiver box of the calutron unit was removed from the calutron and taken to a separate location for cleansing and removal of the end product resulting from the process run. The removal work of the receiver box and the end product contained therein was performed by persons other than those under decedent's supervision.

After the vacuum had been pulled on the calutron unit and the run commenced, heat from electrical elements in the calutron melted the seal on the charge bottle permitting the escape of the uranium tetrachloride in gaseous form. The mechanics of the process and the high vacuum involved were such that any leakage with respect to the calutron operation was contained within the unit itself and did not escape to the outside atmosphere.

Decedent's job activities were managerial and supervisory in nature and in the ordinary course of events would involve less risk to him of exposure to uranium than to the operating personnel supervised by the decedent.

At the end of each operating run, each unit was opened and personnel from the chemistry department would remove various boxes from the machinery. The remainder of the machinery had to be cleaned before it could be reassembled for another operating run. When the isotopes were being separated in the operating runs, they would sometimes smash through the inner shielding, necessitating its repair. Decedent supervised the work of these employees. The chemistry department employees sometimes would dust out the receiving boxes when they pulled them from the unit to return them to the chemistry department. In so dusting, they used a brush and a dust pan. The chemistry department employees, in handling the boxes, wore leather or rubber aprons and gloves, as well as goggles, but did not use monitoring devices. Decedent was not directed to and did not wear any protective clothing. He did not have a sensing device or button and did not see any one in the buildings that he worked wearing any sensing devices.

On an occasion in 1944 it was necessary to stop the operations of many of the units and to remove the material being processed. Decedent stated: "Something was going on, I don't know what, and

they wanted to get all the dust, the good dust that they could get." On that occasion, decedent "actually saw them dust out the boxes into pans, right in our building, not in the chemistry department. * * * They did not take the boxes to the chemistry department, but did it in our building. * * * Now, this is a recollection that has been with me every since I left there." On the occasion when employees emptied so many of the machines, they swept some of the material into the boxes in decedent's department, and in his presence. He was working in Building 9201-3 when the crash project took place of emptying out the machines to get as much material as possible. This project took several days and it was his belief that this was in anticipation of Hiroshima.

Decedent was present on occasions in the building when the machinery was being opened, emptied and being made ready for the next operating run. Decedent's personnel, some of whom wore goggles, were responsible for tearing down the machinery after a particular run, cleaning and chipping material off of the machinery and putting it back together.

Decedent did not have a physical examination when his work terminated in 1945. During his employment he was treated at Oak Ridge Hospital by Dr. White and was told that he had mononucleosis. He was sent to a laboratory where a white blood count was taken and he was then told to rest as best he could while continuing to work.

Decedent was in good health when he left his job at Oak Ridge. From October 1945 until 1953, decedent operated an automobile agency in Brooklyn, New York. In 1953 he was employed by American Home Construction Company until 1958 when he was employed by the City of New York as an evaluation engineer.

In 1958 he began to feel weak and realized something was wrong with his health. He was hospitalized for examination at Prospect Heights Hospital in Brooklyn, New York by Dr. Kaufman.

Dr. Kaufman's diagnosis of anemia was confirmed while he was at the hospital. He was then referred by Dr. Kaufman to Dr. Lee, a hematologist at Maimonides Hospital in Brooklyn. Since 1958 his condition grew continually worse. He became totally disabled in May, 1965 and was required to retire from his job with the City of New York on July 28, 1965 because of disability.

Doctor Lee advised decedent in May, 1965, after Dr. Lee had read the Anderson article, that there was a possibility of connection between his work at Oak Ridge and his physical condition. It was necessary for him to see Dr. Lee at least once or twice a week and receive transfusions on a weekly basis. Decedent knew nothing about radiation when he was employed at Oak Ridge. He believed that the material being processed at Oak Ridge was radioactive, containing Alpha particles.

Plaintiff's decedent prior to his sickness had been an athlete and played golf. He was interested in many sport activities.

Plaintiff must necessarily rely upon Dr. Lee's testimony to establish a causal relationship between decedent's work and his disease since Dr. Lee was his treating physician from 1960 to the date of his death in 1965. As indicated earlier herein, Dr. Lee stated that decedent mentioned to him that he had worked with uranium or other radioactive material at Oak Ridge and indicated that his employment in that area might have some bearing on his physical condition. He then asked the doctor whether he thought there was any relationship between his Oak Ridge work and his trouble and the doctor replied, "I told him that as far as I knew, there was no relationship between the condition I diagnosed in him and any exposure to radiation." This conversation occurred some four or five years prior to decedent's death. Later on, he told decedent there might possibly be some relationship on account of the article that he had read by Anderson about increased incidents of myelofibrosis among people who had been exposed at Hiro-

shima. He then mentioned to decedent or some member of his family "the possibility that maybe there was a relationship now, not now, but maybe there was a relationship—since now there was other evidence that perhaps such a relationship existed." This conversation occurred in May, 1965, according to Dr. Lee.

There are certain cases in which the etiology of myelofibrosis-myeloid metaplasia is known, but in the great majority of the patients it is not known, according to Dr. Lee. Some of the materials, exposure to which is assigned as a cause of the disease, are benzol, dry cleaning chemicals and petroleum products.

In some people the disease follows polycythemia, an increase in the number of red cells. The cause of polycythemia is not known and this prompted Dr. Lee to state "really, we don't know the cause of myelofibrosis which follows it."

Doctor Lee believes that myelofibrosis is a very close relative of leukemia. There are a number of pieces of information that connect leukemia with radiation exposure "and so there is a tendency to say, well, if leukemia can be due to radiation, why not myelofibrosis? I don't know of any other positive evidence."

Even if Dr. Lee knew the amount and type of exposure of radiation to his patient, he could not establish absolutely a connection between the exposure and leukemia. He never gave the decedent a medical opinion to the effect that his myelofibrosis was occasioned by radiation exposure. The most he said was that if there had been exposure it seemed to him that evidence now existed of a possible causal relationship.

The kidney is the critical organ of the body affected by exposure to Alpha particles, but this does not result from the radiation effect but from the effects of the heavy metal uranium. "That has nothing to do with alpha emission."

Although radiation is considered as a possible cause of myelofibrosis, the evidence is inconclusive as to whether it may or may not cause it.

The amount of uranium found by Dr. Harley in his tests of decedent's bones and urine was about normal, but the amount found in his lungs was high. Ultimately, it was testified, most of uranium will end up in the bone, since uranium is in general a bivalent metal, similar to calcium, which is the major constituent of bones.

The toxic effect of uranium is most noticeable and more readily observable and more quickly observable in the kidney than in almost any other portion of the body.

Decedent had a severe urinary tract infection during the course of his treatment, but it is not especially associated with myelofibrosis. One thing which does occur in myelofibrosis and which decedent may have had is kidney stones. People with that condition and other myeloproliferation disorders often develop uric acid stones, and decedent had little crystals in his urine at times.

Doctor Kaufman, a general practitioner of medicine, began to examine decedent in 1954, 1955 or 1956. The examinations were routine and nothing of importance was discovered. Internal gastro-intestinal bleeding was the first serious trouble which occurred in 1959. At that time, decedent's anemic condition was discovered and he was referred to Dr. Lee. At that time decedent stated that he had worked for the Atomic Energy Commission and that he had been exposed to radiation and he felt possibly that was a factor that entered into his physical condition. Dr. Kaufman could not give an opinion as to whether his anemic condition was attributable to the radiation exposure which he said he sustained at Oak Ridge. He thought that it was quite possible that exposure to radiation could have caused the condition. From what he had read, radiation exposure can induce destruction of bone marrow. But Dr. Kaufman is not a hematologist. It was not known whether decedent harbored any radioactive substance during the time that Dr. Kaufman treated him. Dr.

Kaufman testified that exposure to certain toxic substances, from working in chemical plants, petroleum plants, or in dry cleaning establishments, and that exposure to radioactive material and excessive X-ray, etc., can cause myelofibrosis. When decedent was treated by Dr. Kaufman, he had a severe and chronic urinary infection.

Doctor John H. Harley, Director of the Health and Safety Laboratory of the Atomic Energy Commission, analyzed the sample of decedent's urine submitted to him by Dr. Hamilton. A report of the test was furnished to him by the Director of Radio-Chemistry Division of the Atomic Energy Commission, Mr. George Welford, in a memorandum dated October 11, 1965. This test revealed 0.37 microgram of uranium per liter of urine. Sample tests were conducted of the laboratory personnel in the Atomic Energy Health and Safety Laboratory and the highest reading obtained was .30. It was also found that there were .50 disintegrations per minute per liter in decedent's urine specimen. Similar tests were not conducted of the laboratory personnel as Dr. Harley did not think this was necessary. Dr. Harley explained that his laboratory was interested in determining the amount of uranium that could be expected in a person's body from inhalation and ingestion of food, which is sometimes called the background level of uranium since everyone has some uranium in his body.

Shortly after the urine tests were made decedent died and Dr. Harley was requested to analyze samples of bone and lung taken from his body. This was done and a report made November 3, 1965. The report showed .015 microgram of uranium per gram of bone and .130 microgram of uranium per gram of lung tissue. Specimens of bone and lung tissue were taken from nine other residents of New York which ranged from .001 to .003 per gram of bone and .01 to .03 per gram of lung.

The concentration of uranium in the lung tissue of decedent was 40 to 100 times larger than that found in the specimens of nine other residents of New York. Dr. Harley was of the opinion that the tests made were not sufficient to arrive at a conclusion. None of the witnesses were able to explain why more uranium was found in decedent's lung (40 to 100 times) than in any of the nine other lungs which were tested.

The amount found in decedent's lung, if unexplained, would be a factor to consider in determining whether there was any connection between the alleged radiation exposure and the disease.

Natural uranium, and this is the only kind that was found in decedent's body, has very little radiation, according to Dr. Stannard, a specialist in radio-biology and who teaches at the University of Rochester.

Experiments with dogs and monkeys with 5,000 milograms of natural uranium per cubic meter of air resulted in positive uranium in tissues which did no harm. Insoluble uranium remains in lung and soluble material passes from the body through the kidneys. The level for insoluble material is higher. Fifty micrograms of uranium per cubic meter of air of an insoluble material does not do harm. Two hundred fifty micrograms of soluble material is not harmful, according to Dr. Stannard. The amount of uranium found in decedent's bones was not excessive. .130 microgram of uranium found in deceased's lung is higher than for a person not exposed, but is still a small amount. It is an amount several times less than that found in animals which has been found to do no harm. The amount found in decedent's bone was very small. As indicated, the amount found in the lung was higher than found in the lungs of a person not exposed, but was not a sufficient amount to do harm. The amount found in his urine of 0.37 of a gram per liter of urine is not excessive. It was not above the average amount found in unexposed persons and not sufficient to do harm to the kidneys. The lung is a resistant organ to uranium.

Doctor Mahoney studied the effects of radiation in Japan from March, 1953 to March, 1964 and served as deputy direc-

tor for the Government in that research. In 1962 he examined people in the Marshall Islands who were exposed to radiation in 1954. Some of these people suffered with Beta skin burns and minor blood disturbances. They were exposed to Gamma and Beta radiation. They received Alpha emitters but the main damage was by Beta and Gamma emitters. He has made a test of 56 people in Boston but found no radiation in any of them that caused hemoglobic damage. He worked at Oak Ridge in 1954. The delayed effects of radiation are from two, seven to ten years. He doesn't know of any Alpha emitter causing leukemia. He was of the opinion that the amount of uranium found in decedent's lungs was not sufficient to do damage. He was of the opinion that the bone is the risk organ from Alpha emitters. The uranium found in decedent's lungs had no relation to his bone marrow trouble.

Doctor Sterner was Medical Director of Tennessee Eastman Corporation during the period of time involved in this case. He had a staff of six physicians and eighteen nurses at Oak Ridge. The air was measured while the charge bottle and receiver box were being cleaned in the buildings where plaintiff's decedent worked but uranium was never found above the permissible limits. He stated that the kidney is the primary organ involved in uranium radiation. In his opinion the tests made of decedent's bone, lung tissue and urine showed no relation between his work and his disease.

Doctor Hamiton, a scientist, doctor and hematologist of note, stated there was no way to cause bone marrow damage without damage to the kidney. If decedent had been exposed to enriched uranium it would have shown in Dr. Harley's analysis. Only natural uranium was found in decedent's body according to the tests. The amount of uranium found in decedent's lungs was no greater than that to which the public is exposed. He stated that the present case is the first one in which it has been claimed

that radiation caused myelofibrosis and that even if decedent had been swimming in radioactive material his bone marrow could not have been affected without affecting the kidneys. His kidneys were not damaged.

In the opinion of Dr. Hamilton, a causal relationship between decedent's work at Oak Ridge and his myelofibrosis is inconceivable.

Some of the men who worked with decedent and are still working at Oak Ridge testified in the case. These men, or some of them, did the cleaning of the receiver boxes and other units in the calutron. The substance of their testimony was at the end of a run of material, sometimes referred to as cycles, the receiver boxes were opened and dust would drop out on the floor; that the door on the Alpha unit which leads to the receiver boxes was frequently opened during operation, thus causing dust to escape from the unit into the open air. There was testimony that some of the men who handled the materials in the buildings where decedent worked wore rubber gloves, aprons and goggles with metal on their shoes and other protective devices, while there was other testimony that protective devices were not used. This testimony showed that dust and other particles escaped from the calutron during operation into the open atmosphere in areas where employees worked and which were frequented by plaintiff's decedent in his capacity as supervisor.

▇▇▇ The burden of proof was upon plaintiff to show that the disease of myelofibrosis with which her husband suffered and died was caused by his exposure to radiation from Alpha emitters while he worked at Oak Ridge for the Tennessee Eastman Corporation. The relationship between the work and the disease must be shown with reasonable certainty by a preponderance of the evidence before there can be a recovery. The Court is constrained to conclude that plaintiff has not borne this burden. Mahoney v. United States, D.C., 220 F.Supp. 823, 841.

**658**

Since we have held that the relationship between decedent's disease and his work has not been established, it is not deemed necessary to discuss in detail the contentions of the Government that if negligence were established at all it was established against the Tennessee Eastman Corporation, an independent contractor, and for which negligence the Government is not liable.

 This raises a highly debatable and interesting question. The enriched uranium isotopes produce radiation which, if not controlled, is deleterious to the human body. The proof indicates that during the early stages of the operation some enriched uranium material reached the atmosphere where employees worked and that inadequate protective devices were used. The operation was secret and probably the great majority of the employees did not know that they were working in a place where radiated materials existed. Ordinarily, an employer "is not liable for injuries resulting from the performance of work given over by him to an independent contractor." But there are exceptions to this rule, one of which is that "if the location and condition and the nature of the work to be done are such that in the natural course of things mischievous consequences may be expected to arise unless means are adopted by which such consequences may be prevented the owner is under the non-delegable duty to see that appropriate preventative measures are adopted. Another exception is where the work is intrinsically dangerous and the performance of the contract would probably result in injury to third persons or the public * * *" Mahoney v. United States, supra, p. 826. See: Pierce v. United States, 142 F. Supp. 721 (D.C.E.D.Tenn.); Benson v. United States, 150 F.Supp. 610 (D.C. N.D.Cal.); contra, Lipka v. United States, 369 F.2d 288 (C.A.2, 1966); United States v. Page, 350 F.2d 28 (C.A. 10, 1965).

An order will be presented in conformity with the views here stated.