MANSON–OSBERG COMPANY, Appellant,

v.

STATE of Alaska, Appellee.

No. 1839.

Supreme Court of Alaska.

July 19, 1976.

Robert L. Eastaugh, of Delaney, Wiles, Moore, Hayes & Reitman, Inc., Anchorage, for appellant.

Sanford M. Gibbs, of Hagans, Smith & Brown, Anchorage, for appellee.

Before RABINOWITZ, C. J., and CONNOR, ERWIN, BOOCHEVER and BURKE, JJ.

CONNOR, Justice.

## OPINION

This case concerns the effectiveness of express indemnity clauses in construction contracts.

On March 28, 1967, ironworker Steven G. Weber was operating a jack from a small, unrailed scaffold suspended below the Tanana Bridge project about 40 feet above the Tanana River. His employer, Manson-Osberg Company was constructing the bridge as contractor for the State of Alaska. Manson-Osberg did not provide safety nets, tie lines or other safety equipment. Weber's improvised, non-locking jack handle extension suddenly came loose as he worked, pitching him over the edge of the unrailed scaffold to his death below.

Manson-Osberg was required under its construction contract with the state to provide all safety devices necessary on the job. The State Department of Highways had assigned an engineering inspection party to live at the project to ensure that the bridge was built to specifications, but the details of the work were directed and controlled by Manson-Osberg employees.[1]

---

1. The pertinent findings of fact by the trial court are as follows:

"12. M–O [Manson-Osberg] did not furnish safety lines, safety harnesses, safety belts or tie lines to men working off the ground. Nor did M–O provide safety nets under those working off the ground. No state employee ever requested M–O to provide safety equipment or officially criticized M–O's safety practices.

"13. M–O did not employ a safety engineer nor conduct regular safety meetings. M–O's employees did not attend safety meetings conducted on the site by employees of the State of Alaska.

"14. The Department of Highways assigned an engineering inspection party to the project on a full-time basis. . . .

"15. The details of the work were directed and controlled by M–O employees. The State's engineering party limited itself to erection and assembly problems and insuring that the bridge was built in accordance with the specifications. Since the removal of camber blocking [Weber's activity at the time of his fall] was not covered by specifications, this part of the project was not inspected or a matter of concern to the engineering party.

"16. The State inspection party lived in the same camp as the iron workers and

Weber's estate sued the State of Alaska for wrongful death, based on theories of both vicarious and independent liability for negligence. The state claimed indemnity from Manson-Osberg under the construction contract "save harmless" provision, and tendered the defense to Manson-Osberg. Manson-Osberg denied liability under the indemnity clause and rejected the tendered defense.

On a motion for summary judgment, the state was held not to be vicariously liable to Weber's estate for the acts of Manson-Osberg. One question of direct liability was preserved for trial: Whether the state's retained control of the work was

worked the same hours. State inspectors were on the bridge proper at the time of Weber's death.

"20. Among the provisions of the contract and included in the so-called 'green sheet' (Required Contract Provisions Federal-Aid Contracts Primary Highways (exclusive of interstate) was the following provision:

'SAFETY: ACCIDENT PREVENTION In the performance of this contract, the contractor shall comply with all applicable Federal, State and local rules governing safety, health and sanitation. The contractor shall provide all safeguards, safety devices and protective equipment and take any other needed actions, on his own responsibility, *or as the State Highway Department contracting officer may determine, reasonably necessary to protect the life and health of employees* on the job and the safety of the public and to protect property in connection with the performance of the work covered by the contract.' (Emphasis supplied.)

"22. Turning to the 'supplement' (defendant's exhibit D) we find Article 8.7 which provides:

'The engineer may by written order suspend performance of the work, either in whole or in part, for such period as he may deem necessary due to unsuitable weather, to conditions considered unfavorable for the suitable performance of the work, *or to failure on the part of the contractor to correct conditions unsafe for the workmen or* the general public, to carry out orders given by the engineer, or to perform any provisions of the contract. Suspensions listed above will not be justification for a change in the completion date.' (Emphasis supplied.)

"24. The State of Alaska, Department of Highways, had not adopted any practices, rules or regulations governing the responsibility of project engineers to insure contractor compliance with the safety requirements of this contract or to otherwise supervise the contractor's safety practices to protect his employees.

"25. Consequently, as a matter of practice it was left to the individual project engineer on State jobs to determine how active a part he would play in exercising the powers granted him under highway contracts. In the in-

stant case Mr. Stewart and Mr. McCaleb partly based upon their understanding of the unarticulated 'policy' of the Central District Highway Department chose to leave all responsibility for enforcing the safety requirements of the contract on the State Department of Labor.

· "26. Mr. Burton Doucette, an employee of the State Department of Labor, Industrial Safety Division, made periodic inspections at this bridge. . . .

"27. The project engineer knew or in the exercise of reasonable care would have discovered that a substantial amount of work was being done by iron workers employed by M–O more than 40 feet off the ground without safety belts, safety harnesses, safety lines, or safety nets underneath them. Further, the project engineer in the exercise of reasonable care should have known that Weber was working on a 'float' 40 feet off the ground without such safety devices and that the float upon which he was working was not equipped with a guard rail as required by § 314–03 of the State of Alaska Construction Safety Code.

"28. M–O's failure to provide some safety device whether safety belt, safety harness, or tie line was negligence and a proximate cause of Weber's death. Likewise, M–O's utilization of an extension handle not equipped with a locking device in the operation in which Weber was involved almost 40 feet off the ground was negligence and a proximate cause of Weber's injury.

"29. The State's project engineer was negligent in not discovering the absence of safety devices to prevent injury in the event of a fall and in failing to use reasonable care to cause M–O to remedy these dangers. Thus, M–O's negligence is not an 'intervening cause' insulating the State's project engineer from liability.

"32. Given the power available to the project engineer, it is more probable than not that had he directed M–O to provide a guard rail, it would have done so. Had any of these safety devices been provided, it is more likely than not that Weber would not have died.

"33. Had the State of Alaska, through its project engineer, exercised due care in discovering and correcting unsafe practices Weber's death would not have occurred."

sufficient to impose on it a duty to supervise Manson-Osberg's activities.[2] By applying this theory of liability for independent negligence, the trial court found the state liable in damages to Weber's estate in the sum of $202,714.69, including interest and attorney fees. The validity of that judgment is before this court in two other appeals.

On a motion for summary judgment on the third-party complaint, the trial court found Manson-Osberg liable to the state under the indemnity clause for the judgment rendered in favor of Weber's estate and against the state, together with costs and attorney's fees in that action. The indemnity provision provides:

> *"Responsibility for Damage Claims.* The contractor shall save harmless the government and all of its representatives from all suits, actions, or claims of any character brought on account of any injuries or damages sustained by any person or property in consequence of any neglect in safeguarding the work, or through the use of unacceptable materials in the construction of the improvement, or on account of any act or omission by the said contractor or his employees, or from any claims or amounts arising or recovered under the workmen's compensation laws or any other law, bylaw, ordinance, regulation, order, or decree. During the prosecution of the work the contractor shall be responsible for all damage or injury to any person or property of any character resulting from any act, omission, neglect or misconduct in the manner or method of executing said work satisfactorily, or due to the non-execution of said work at any time, or due to defective work or materials, and said responsibility shall continue until the date of final inspection provided in Art. 5.6"

The court reasoned that Weber's death arose because of "neglect in safeguarding the work."

> "Specifically, the State's duty, which I found to have been breached, was a duty to discover Manson-Osberg's failure to carry out its contractual provision to safeguard the work and to exercise reasonable care to compel Manson-Osberg to carry out its contractual responsibilities. It is undisputed that as between the State and Manson-Osberg, Manson-Osberg had the sole responsibility for safeguarding the work. Thus, Morris' claim clearly was one within the indemnity provision. . . ."[3]

The court further awarded the state "actual attorney's fees" of $3,636.50 as the prevailing party in the third-party indemnity claim against Manson-Osberg.

Both the indemnity award and the award of "actual attorney's fees" are on appeal in the case at bar.

---

2. The trial court stated:

"Suffice to say, I found that, as a matter of law, the State was not vicariously liable for the acts of Manson-Osberg. I further found that the State was not independently liable to the estate of Weber as a matter of law on all but one rather narrow issue which was reserved for trial. That issue was whether, under the common law of Alaska, a landowner or general contractor utilizing the services of a supervising engineer or architect entitled under the contract with the general contractor to enforce safety regulations on the job could be liable to an injured employee of the contractor where the negligence of the contractor, in failing to provide a safe working place, is a proximate cause of the employee's injury; and the supervising architect or engineer, having the contractual power to compel the contractor to provide a safe place to work, negligently fails to do so."

This theory was based on Restatement (Second) of Torts § 414, which provides:

"One who entrusts work to an independent contractor, but who retains the control of any part of the work, is subject to liability for physical harm to others for whose safety the employer owes a duty to exercise reasonable care, which is caused by his failure to exercise his control with reasonable care."

3. Morris is the administratrix of Weber's estate.

*Effect of the Workmen's Compensation Act*

We must first consider Manson-Osberg's contention that the exclusive liability provision of the Alaska Workmen's Compensation Act renders the indemnity contract invalid. AS 23.30.055 provides in part:

"The liability of an employer [for workmen's compensation] is exclusive and in place of all other liability of the employer . . . to the employee . . . and anyone otherwise entitled to recover damages from the employer . . . at law or in admiralty *on account of the injury or death.*" (Emphasis added.)

"The clearest exception to the exclusive-liability clause is the third party's right to enforce an express contract in which the employer agrees to indemnify the third party for the very kind of loss that the third party has been made to pay to the employee." 2 A. Larson, Workmen's Compensation Law § 76.40, at 14–324 (1975).

In *Ryan Stevedoring Co. v. Pan-Atlantic S.S. Corp.,* 350 U.S. 124, 76 S.Ct. 232, 100 L.Ed. 133 (1956) (action in admiralty, now abolished by 33 U.S.C. § 905(b) (1972)), the United States Supreme Court implied an indemnity provision in a stevedore's contract. It permitted a third party shipowner to receive indemnity from a stevedore-employer for damages obtained by the stevedore's employee from the shipowner on a strict liability theory. The stevedore argued that a provision in the Longshoremen's and Harbor Worker's Compensation Act similar in wording to Alaska's exclusive liability section prevented liability, but the Supreme Court disagreed.

"The Act nowhere expressly excludes or limits a shipowner's right, as a third person, to insure itself against such a liability either by a bond of indemnity, or the contractor's own agreement to save the shipowner harmless. . . .

In the face of a formal bond of indemnity this statute clearly does not cut off a shipowner's right to recover from a bonding company. . . . Such a liability springs from an independent contractual right. It is not an action . . . to recover damages 'on account of' an employee's 'injury or death.'" (350 U.S. at 130, 76 S.Ct. at 235.)[4]

This policy decision has been widely followed.

"Invariably, when a contractual right of indemnity is the basis of the cause of action, the courts permit recovery by a third party from an injured workman's employer simply because the cause of action arises out of an *independently created* contractual right which is totally independent of the exclusive jurisdiction provisions of the workmen's compensation act, so long as the compensation act itself does not prohibit such agreements." (Emphasis in original.) *Tucci & Sons, Inc. v. Carl T. Madsen, Inc.,* 1 Wash. App. 1035, 467 P.2d 386, 389–90 (1970); *see generally* 2 A. Larson, Workmen's Compensation Law § 76.41 & n. 37 (1975).

Manson-Osberg cites *Gulf Oil Corp. v. Rota-Cone Field Operating Co.,* 84 N.M. 483, 505 P.2d 78 (1972). In light of a strong New Mexico policy, based on statutory language and prior judicial *dicta* that, besides workmen's compensation, employers "shall not be subject to any other liability whatsoever for the death of . . . any employee",[5] the court refused to enforce an express indemnity contract clause against an employer.

---

4. The *Ryan* court erroneously thought the federal statute included language barring liability only to persons "claiming under or through such employee." It also equated plaintiffs with those receiving a quid pro quo in the form of workmen's compensation. The statute contained neither limitation, but these errors did not seriously affect the outcome, or subsequent cases. 2 A. Larson, Workmen's Compensation Law § 76.22, at 14–309 (1975).

5. Section 59–10–6, N.M.S.A.1953 (Repl.Vol. 9, pt. 1 (Supp.1971)) ; 505 P.2d at 79.

The Alaska statutory language, ". . . in place of all other liability . . .," does not seem to evidence as strong a policy as does the New Mexico language quoted above. While we reserved the question of express contract indemnity in *Golden Valley Elec. Ass'n v. City Elec. Serv., Inc.*, 518 P.2d 65 (Alaska 1974), we suggested that an express indemnity provision could survive under AS 23.30.055 (518 P.2d at 67, 69).[6] We now hold that an express indemnity clause will be enforceable, despite workmen's compensation exclusive liability as contained in AS 23.30.055. We adhere, however, to our earlier decision in *Golden Valley, supra*, that implied contractual indemnity is precluded by AS 23.30.055.

*Interpretation of the Indemnity Agreement*

We find the language of the indemnity agreement sufficiently broad to cover this situation. We agree with the trial court that "any neglect in safeguarding the work" indicates a desire on the part of the parties to contract as to the liability involved in this case. The contract unambiguously makes Manson-Osberg responsible for paying any damages resulting from such neglect, via indemnity.[7] The better rule in modern cases is that the unambiguous language of an indemnity clause as "reasonably construed" should be given effect, even if it does not contain words specifying indemnity for the indemnitee's own negligence. *See Northwest*

*Airlines, Inc. v. Alaska Airlines, Inc.*, 351 F.2d 253, 256 (9th Cir. 1965); *see also United States v. Seckinger*, 397 U.S. 203, 213 n. 17, 90 S.Ct. 880, 25 L.Ed.2d 224 (1970); *Smith v. United States*, 497 F.2d 500, 507–09 (5th Cir. 1974); *Levine v. Shell Oil Co.*, 28 N.Y.2d 205, 321 N.Y.S.2d 81, 269 N.E.2d 799 (1971).[8] In modern commerce, indemnity clauses are no longer so unusual as to require such specific mention of the indemnitee's conduct as being within the scope of the indemnifying obligation. *Jacksonville Terminal Co. v. Railway Express Agency, Inc.*, 296 F.2d 256, 262 (5th Cir. 1961).[9]

A majority of jurisdictions have rejected the old view that indemnity clauses for an indemnitee's own negligence are unenforceable because they are against public policy. *Jacksonville Terminal Co. v. Railway Express Agency, Inc., supra* at 263 n.3; *but see Northwest Airlines, Inc. v. Alaska Airlines, Inc., supra* at 258 (interpreting Alaska law). This revision in judicial thinking is attributable to the widespread contemporary use of insurance, in a variety of business and personal settings, as a means of allocating risks. There are, however, instances when a court will not give effect to a contractual provision indemnifying the indemnitee's own negligence. These are cases where the indemnity clause tends to promote breach of a duty owing to the

6. The State of Alaska cites several cases as "examples" of this principle; Manson-Osberg seeks to distinguish most of them away. Although *Lechuga, Inc. v. Montgomery*, 12 Ariz.App. 32, 467 P.2d 256 (1970), is not good authority for the state, *Republic Steel Corp. v. Glaros*, 12 Ohio App.2d 29, 230 N.E.2d 667 (1967), and *Bar Steel Construction Corp. v. Read*, 277 A.2d 678 (Del. 1971), support the proposition that a specific indemnity clause will not be barred by an exclusive liability statute, even though they do not detract from Manson-Osberg's argument that the policy of exclusive liability requires strict interpretation of ambiguous indemnity clauses.

7. We do not believe that a fair reading of the contract allows "neglect" to be modified by the phrase "by the said contractor." *See also* contract Article 7.14, which provides that "the contractor [Manson-Osberg] shall furnish such safeguards and safety devices and shall take such actions as are necessary to protect employees and the public."

8. *Levine* did not involve workmen's compensation or the exclusive liability provision. The law of lease indemnity covenants for one's "own negligence" in New York has been changed since *Levine*. *See* New York General Obligations Law § 5–321; *McLean v. L. P. W. Realty Corp.*, 507 F.2d 1032, 1033 (2d Cir. 1974).

9. As to Florida law, which may require an explicit statement, *see Gulf Oil Corp. v. Atlantic Coast Line R.R.*, 196 So.2d 456, 457 (Fla.App.1967).

public at large. *Northwest Airlines, Inc. v. Alaska Airlines, Inc., supra; Air Transport Associates v. United States,* 221 F.2d 467 (9th Cir. 1955) ; *Otis Elevator Co. v. Maryland Casualty Co.,* 95 Colo. 99, 33 P. 2d 974 (1934). Such is not the case here, and we cannot perceive any public policy objection to holding Manson-Osberg to its indemnity agreement. *Bisso v. Inland Waterways Corp.,* 349 U.S. 85, 99 L.Ed. 911, 75 S.Ct. 629, 99 L.Ed. 911 (1955) ; *Northwest Airlines, Inc. v. Alaska Airlines, Inc., supra* at 257 n.2.

As to the matter of attorney's fees, we find that there was no error in an award of full attorney's fees in this matter. While Civil Rule 82 would normally only allow an award which would "partially compensate" the prevailing party,[10] we hold that the "hold harmless" indemnity clause should include the cost of recovery on the clause itself, as a matter of policy.[11] We uphold the trial court's ruling upon this ground. *Ransom v. Haner,* 362 P.2d 282 (Alaska 1961). The hold harmless clause required that the contractor shall save harmless the government from all suits, actions, or claims of any character brought on any account of injuries or damages sustained by any person. The government is not held harmless if it must incur costs and attorney's fees in bringing suit to recover on the indemnity clause. The contractor on the other hand can avoid such costs and attorney's fees by paying the amount due without the necessity of suit. If, of course, the contractor has a just defense to all or a portion of the indemnity claim and offers to make payment of the portion to which there is no such just defense, the costs and attorney's fees would be voided and under Rule 68 the contractor would be entitled to recover from the date of making such offer of settlement.

AFFIRMED.

10. *Malvo v. J. C. Penney Co.,* 512 P.2d 575, 586–87 (Alaska 1973) ; *see Stafford v. Westchester Fire Ins. Co.,* 526 P.2d 37, 44 (Alaska 1974).

11. In so deciding we are not unmindful that the general rule holds the other way. *E. g., Grigsby v. Coastal Marine Service, Inc.,* 317 F.Supp. 1113 (W.D.La.1969).