**STATE of Alaska, Appellant,**

**v.**

**Mildred R. MORRIS, Administratrix of the Estate of Steven G. Weber, Deceased, Appellee.**

**Mildred R. MORRIS, Administratrix of the Estate of Steven G. Weber, Deceased, Cross-Appellant,**

**v.**

**STATE of Alaska, Cross-Appellee.**

**Nos. 2218 and 2253.**

Supreme Court of Alaska.

Oct. 29, 1976.

Robert L. Eastaugh, Delaney, Wiles, Moore, Hayes & Reitman, Anchorage, for appellant.

Allen L. Jewell, Hahn, Jewell & Stanfill, Anchorage, for appellee.

Before BOOCHEVER, Chief Justice, RABINOWITZ, CONNOR and ERWIN, Justices, and DIMOND, Justice Pro Tem.

## OPINION

CONNOR, Justice.

On March 28, 1967, ironworker Steven G. Weber was operating a jack from a small scaffold without guardrails, suspended below the Tanana Bridge project about 40 feet above the Tanana River. His employer, Manson-Osberg Company, was constructing the bridge as contractor for the State of Alaska, and negligently failed to provide safety nets, tie lines or other safety equipment. Weber's makeshift, nonlocking jack handle extension suddenly came loose, pitching Weber over the edge of the scaffold to his death below. Manson-Osberg has paid workmen's compensation benefits for the death.

Manson-Osberg was required under its construction contract with the state to provide all safety devices necessary on the job. The State Department of Highways had assigned an engineering inspection party to live at the project to ensure that the bridge was built to specification. The details of the work were directed and controlled by Manson-Osberg employees. The state's engineering party limited itself to erection and assembly problems and to ensuring that the bridge was built in accordance with specifications.

Weber's estate sued the State of Alaska for wrongful death, based on claims of both vicarious liability and liability for independent negligence. The state claimed indemnity from Manson-Osberg. Its claim was sustained by this court. *Manson-Osberg Co. v. State,* 552 P.2d 654 (Alaska 1976).

On a motion for summary judgment, the state was found not to be vicariously liable to Weber's estate for the acts of Manson-Osberg, and not to be independently liable under most of the various theories ad-

vanced by plaintiff (Morris). From that judgment, Morris cross-appeals. One rather narrow issue of independent liability was preserved for trial: whether the state retained sufficient control over the project to support liability under principles of common law.[1] After trial by the court sitting without a jury, liability was found on this theory.[2] From this determination the state appeals, both on the ground that as a matter of law the state owed no duty to Weber, and on the ground that Weber was contributorily negligent.[3]

 We hold that the state did not retain sufficient control to subject it to liability under principles of common law.

"It has been repeatedly held in our Courts that even though the owner reserves the right to exercise that degree of supervision and control to assure himself that the contract specifications are being met, yet he will not be held liable for the negligent methods of the contractor or subcontractor." (Citations omitted) *Caldwell v. State*, 39 Misc.2d 898, 242 N.Y.S.2d 316, 318 (1963), *aff'd*, 22 A.D.2d 834, 253 N.Y.S.2d 825 (1964).[4]

"[N]or does the contracting owner incur a duty to the employees of an independent contractor merely by reserving the right to conduct safety inspections or to prescribe safety requirements." *Orr v. United States*, 486 F.2d 270, 275 (5th Cir. 1973) (Wisdom, J.).[5]

*See Fisher v. United States*, 441 F.2d 1288, 1290–92 (3rd Cir. 1971); *United States v. Page*, 350 F.2d 28, 29–31 (10th Cir. 1965), *cert. denied*, 382 U.S. 979, 86 S.Ct. 552, 15 L.Ed.2d 470 (1966);[6] *Seeney v. Dover Country Club Apartments, Inc.*, 318 A.2d 619, 621–22 (Del.Super.1974); *but see Quinones v. Township of Upper Moreland*,

---

1. "Suffice to say, I found that, as a matter of law, the State was not vicariously liable for the acts of Manson-Osberg. I further found that the State was not independently liable to the estate of Weber as a matter of law on all but one rather narrow issue which was reserved for trial. That issue was whether, under the common law of Alaska, a landowner or general contractor utilizing the services of a supervising engineer or architect entitled under the contract with the general contractor to enforce safety regulations on the job could be liable to an injured employee of the contractor where the negligence of the contractor, in failing to provide a safe working place, is a proximate cause of the employee's injury; and the supervising architect or engineer, having the contractual power to compel the contractor to provide a safe place to work, negligently fails to do so." *Decision Granting Summary Judgment to Third Party Plaintiff Against Third Party Defendant.*

2. The trial court noted, but did not specifically rely upon, Restatement (Second) of Torts § 414 (1965), which provides:
 "One who entrusts work to an independent contractor, but who retains the control of any part of the work, is subject to liability for physical harm to others for whose safety the employer owes a duty to exercise reasonable care, which is caused by his failure to exercise his control with reasonable care."

3. An advisory jury was requested by the state on the issue of damages. Weber was found to have lived about four hours after his fall, but for at least some of that time he was unconscious or semi-conscious. The advisory jury awarded Weber's estate $35,000 for pain and suffering, and the trial judge independently entered an award for that amount based on a formula, as well as other damages. From this award the state also appeals.

4. In *Caldwell*, two state engineers were on duty. The contract "reserv[ed] [the] right to inspect and control" to "make certain that the results produced conformed to the plans." 242 N.Y.S.2d at 318. The inspectors "gave no direct orders to the contractors or their employees, nor did they attempt to exercise any control over the methods used." *Id.* at 317.

5. Liability was ultimately imposed on the government in the *Orr* case for the government's failure to meet its high duty of care under Florida law owed to workers performing "hazardous jobs." 486 F.2d at 275–76. The government failed to shut off the power in a high tension line that it owned.

6. The trial court in *Fisher v. United States*, 299 F.Supp. 1 (E.D.Pa.1969), tried to distinguish *Page* on the ground that the *Page* plant actually belonged to the contractor. *Id.* at 17. The *Fisher* trial court was reversed on appeal. *Fisher v. United States*, 441 F.2d 1288 (3rd Cir. 1971).

293 F.2d 237, 241 (3rd Cir. 1961);[7] *Pasko v. Commonwealth Edison Co.,* 14 Ill.App.3d 481, 302 N.E.2d 642, 648–49 (1973); Restatement (Second) of Torts § 414 (1965). In the case at bar, it was found below that the "details of the work were directed and controlled by Manson-Osberg employees," not the state inspectors;[8] that the inspectors were only concerned with "erection and assembly problems and insuring that the bridge was built in accordance with the specifications," and that Weber's work at the time of his death was not "inspected or a matter of concern to the engineering party."

We see little benefit in safety control to be gained by imposing liability in this case. Because we permit express indemnity, *Manson-Osberg Co. v. State,* 552 P.2d 654 (Alaska 1976), any owner would simply contract away this liability if he has sufficient bargaining power. The state cannot be distinguished from any other owner in this regard. Moreover, the state could conceivably refuse to conduct any safety inspection at all, at least where no federal funding is involved. Other forces including union pressure, enforcement of safety regulations by the Department of Labor, and workmen's compensation insurance premium experience ratings help to encourage safety. Thus the policy of preventing future harm would not be promoted by imposing liability in a case such as this.

The dissent would impose liability on the state which is not imposed on anyone else. Our holding treats the Department of Highways the same as any other owner possessing large amounts of bargaining power and a large, formalized, internal administrative structure. The Department of Highways has no greater connection with the process of legislating safety policy than does any large business involved in public contracting. No greater duty should be placed on the Department of Highways than upon the private owner. Certainly there is no warrant for requiring the Department to insure on-the-job safety while other owners do not.

It is the duty of the executive and legislative branches of government, and not the judiciary, to allocate money, personnel and other resources to the various departments, to instruct them in their various tasks and to determine the priorities of competing governmental policies in the absence of general legal mandates. Nor do we interpret AS 18.60.030(3) and (5) as delegating any part of that duty to the Department of Highways.[9] Moreover, we would have difficulty in creating a common law liability out of statutory language which merely requires that the Department of Labor should work in coopera-

---

7. We note that the third circuit has not followed *Quinones,* if it is of general applicability. *Fisher v. United States,* 441 F.2d 1288 (3rd Cir. 1971). It has been said that *Quinones* is unique, and probably based on the peculiarities of Pennsylvania statutory law. *Chesin Constr. Co. v. Epstein,* 8 Ariz.App. 312, 446 P.2d 11, 16–17 (1968); *see Quinones, supra,* at 241.

8. We do not reach the question of whether employees of an independent contractor are "others," and hence owed any duties, under the common law as expressed in Restatement (Second) of Torts § 414 (1965).

9. AS 18.60.030(3) and (5) provide in pertinent parts as follows:
"The Department of Labor shall . . .
(3) work in cooperation with official and unofficial organizations and instrumentalities in the state which are interested in the promotion of safety so that possible resources can be marshalled and utilized to reduce the menace of accidental death and injury; . . .
(5) advise with the public agencies responsible for safeguarding the people against accidents, and especially with the Department of Public Works, the Department of Public Safety, the Department of Education, Department of Natural Resources, Department of Health and Social Services, and the heads or representatives of federal departments and agencies operating in the state particularly concerned with safety programs and accident prevention . . . . "

tion with and advise other public agencies in safety matters.

That the Department of Labor inspectors are overworked would not justify demanding a reallocation of their duties to the Department of Highways, simply because of unfavorable overall job accident satistics. The difficulties of such a reallocation should be apparent. It is conceivable that an inspector whose day is filled with concern over each ascertainable safety defect affecting workmen would do a much poorer job in inspecting the composition and construction of the work product itself—a duty which is necessary for the protection of the travelling public. While workmen are protected by Workmen's Compensation, the public has no such comprehensive remedy. It is, therefore, far from an arbitrary or capricious decision on the part of the executive branch of government to focus more attention on the safety of the road than on the safety of the workmen, especially since the contractor under the contract has the primary duty to safeguard the latter.

■ We must now consider the various theories of liability advanced by Morris on cross-appeal. We have already indicated why Morris' theories of independent liability based on retained control or assumption of responsibility to provide protection, *see generally Shannon v. City of Anchorage,* 429 P.2d 17 (Alaska 1967), are meritless. We further hold. that the state merely retained a right to supervise with respect to

safety, but did not contractually impose a duty on itself to do so. *See Baum v. United States,* 427 F.2d 215, 218 (5th Cir.), *cert. denied,* 400 U.S. 916, 91 S.Ct. 175, 27 L.Ed.2d 155 (1970); *Gowdy v. United States,* 412 F.2d 525, 529 (6th Cir.), *cert. denied,* 396 U.S. 960, 90 S.Ct. 437, 24 L. Ed.2d 425 (1969); *Grogan v. United States,* 341 F.2d 39, 43 (6th Cir. 1965); *Epperly v. City of Seattle,* 65 Wash.2d 777, 399 P.2d 591, 596 (1965). Article 7.14 of the contract clearly provided that the duty of safeguarding the work lay with Manson-Osberg,[10] and Article 7.9 provided for Manson-Osberg to indemnify the state should the state be held for any damages due to "any neglect in safeguarding the work." *See Manson-Osberg Co. v. State,* 552 P.2d 654, 657 (Alaska 1976). Thus the state did not incur any duty to Weber via its contract with Manson-Osberg.

■ Plaintiffs argue that the state should be held vicariously liable for Manson-Osberg's failure to provide safety equipment. They assert that Weber's work was inherently dangerous, and that therefore the state's duties were not delegable to an independent contractor. *See* Restatement (Second) of Torts §§ 416, 424,[11] 427 (1965). We have held in *Sloan v. Atlantic Richfield Co.,* 552 P.2d 157 (Alaska 1976), and *Morris v. City of Soldotna,* 553 P.2d 474 (Alaska 1976), that the employee of an independent contractor does not fall within the class of persons protected by common law vicarious liability principles, and referred to as "others" by §§ 416,[12] 422[13]

10. Article 7.14 provided, in relevant part: "The contractor [Manson-Osberg] shall furnish such safeguards and safety devices and shall take such actions as are necessary to protect employees and the public."

11. To the extent that the common law as illustrated by § 424 involves independent negligence *per se,* we do not reach the issue of whether Weber was an "other," since we find against such liability below on other grounds.

12. Restatement (Second) of Torts § 416 (1965) provides: "One who employs an independent contractor to do that which the employer should recognize as likely to produce. during its

progress a peculiar risk of physical harm to others unless special precautions are taken, is subject to liability for physical harm caused to them for the failure of the contractor to exercise reasonable care to take such precautions, even though the employer has provided for such precautions in the contract or otherwise."

13. Restatement (Second) of Torts § 422 (1965) provides: "A possessor of land who entrusts to an independent contractor construction, repair, or other work on the land, or on a building or other structure upon it, is subject to the same liability as. though he had retained the

and 427 [14] of the Restatement. There is a difference between employees of an independent contractor and unprotected members of the general public, since the employees are protected under the Workmen's Compensation Act. Imposing full liability on the innocent owner would subject him to a greater financial burden than if he had directly employed the injured workman himself, since in the latter case his liability would be limited to workmen's compensation benefits. The imposition of greater liability on the remote party liable only vicariously is not a justifiable result at common law. *See Matanuska Electric Ass'n v. Johnson,* 386 P.2d 698, 702 (Alaska 1963); *accord, e. g., King v. Shelby Rural Elec. Coop.,* 502 S.W.2d 659, 662–63 (Ky.1973), *cert. denied,* 417 U.S. 932, 94 S.Ct. 2644, 41 L.Ed.2d 235 (1974); *Welker v. Kennecott Copper Co.,* 1 Ariz.App. 395, 403 P.2d 330, 338–39 (1965); *contra, e. g., Van Arsdale v. Hollinger,* 68 Cal.2d 245, 66 Cal.Rptr. 20, 437 P.2d 508, 514 (1968); *see generally* Restatement (Second) of Torts, Special Note to Chapter 15, at 17–18 (Tent. Draft No. 7, 1962).

■ Finally, we decline to hold that the state is an "emoplyer" for purposes of civil liability *per se* under the Alaska "Safe Place to Work Act", AS 18.60.075,[15] and various administrative safety regulations. *See, e. g.,* General Safety Code, ch. XIX, § 314.03 (in 1967 found in Construction Safety Code, ch. XV) (scaffolding over 8 feet high to contain a safety rail). We find that the "common and approved usage" [16] of the word "employer" does not allow the state to be classified as an employer of Weber. Plaintiff should cite *State v. Marathon Oil Co.,* 528 P.2d 293, 297 (Alaska 1974), in support of a more liberal definition of "employer" in this context. However, *Marathon* was a criminal case, involving a positive violation of the safety code by Marathon Oil Company. In the case at bar, the state was very remote from the conduct constituting a violation. Furthermore, the question is whether Weber should be allowed to recover civil damages for a violation, not merely whether a violation has occurred, as is the case in criminal proceedings such as *Marathon.*[17]

In light of our holdings above, we find it unnecessary to address the issues of con-

---

work in his own hands to others on or outside of the land for physical harm caused to them by the unsafe condition of the structure
 (a) while the possessor has retained possession of land during the progress of the work, or
 (b) after he has resumed possession of the land upon its completion."

14. Restatement (Second) of Torts § 427 (1965) provides:
"One who employs an independent contractor to do work involving a special danger to *others* which the employer knows or has reason to know to be inherent in or normal to the work, or which he contemplates or has reason to contemplate when making the contract, is subject to liability for physical harm caused to *others* by the contractor's failure to take reasonable precautions against such danger." (Emphasis added)

15. AS 18.60.075 read in 1967, in relevant part:
"Safe employment. An employer shall (1) furnish employment which is reasonably safe; (2) furnish and use safety devices

and safeguards; (3) adopt and use methods and processes reasonably adequate to render the employment or place of employment reasonably safe; and (4) do every other thing reasonably necessary to protect the life, health, safety and welfare of employees."

16. *See* AS 01.10.040; see also AS 18.60.105 for the circular statutory definition of "employer" in terms of an "employee."

17. We do not consider any questions of state liability based on the conduct of Burton Doucette or the Department of Labor. Judge Singleton ruled that the enforcement of statutes or safety regulations by Department of Labor safety inspectors, as with police officers, is a discretionary function as to the decision to make such inspections. Hence, the failure to make an inspection cannot be the subject of tort liability. AS 09.50.250 (1). *Cf. Adams v. State,* 555 P.2d 235 Opin. No. 1318 (Alaska 1976) and *State v. Jennings,* 555 P.2d 248 Opin. No. 1319 (Alaska 1976). Appellees did not brief this issue. *Wernberg v. Matanuska Elec. Ass'n,* 494 P.2d 790, 794 (Alaska 1972); *Lewis v. State,* 469 P.2d 689, 691–92 n. 2 (Alaska 1970).

tributory negligence or the pain and suffering award. We reverse and remand for entry of judgment in favor of defendants.

REVERSED.

BOOCHEVER, C. J., with whom DIMOND, J. pro tem., joins, dissents.

BURKE, J., not participating.

BOOCHEVER, Chief Justice, with whom DIMOND, Justice Pro Tem. joins (dissenting).

While I agree with the majority in its discussion of the Restatement of Torts (Second) §§ 414, 416, 422 and 427 which relate to retaining control and to vicarious liability, I must dissent in the result of this case. It is my opinion that where a state Department of Highways inspector knows or should have known of existing violations of safety regulations, he has a duty to act reasonably to secure correction of those violations. A breach of this duty by a state agent should create direct liability for negligence at common law.

While it is true that the state retained no direct control over the occupational safety of the employees of the independent contractor, the Department of Highways had assigned an inspection party consisting of a project engineer, his assistant, a chief inspector and two other inspectors to the project on a full-time basis. No state employee ever requested Manson-Osberg to provide safety equipment or officially criticized M-O's safety practices.

The details of the work were directed by M-O employees. The state's inspectors limited their supervision to insuring that erection and assembly of the bridge were performed in accordance with contract specifications. The state inspectors lived in the same camp as the ironworkers, worked the same hours and were on the bridge at the time of Mr. Weber's death.

Under the contract, M-O agreed that the project would be constructed under the direct supervision and to the complete satisfaction of the state Department of Highways, subject to inspection at all times and in accordance with the laws of the state and the rules and regulations applicable to federal highway projects. The contract required compliance with all applicable federal, state and local rules governing safety. The contractor was required to

provide all safeguards, safety devices and protective equipment and take any other needed actions on his own responsibility, or as the State Highway Department contracting officer may determine, reasonably necessary to protect the life and health of employees on the job.

. . .

The state engineer was authorized under the contract to suspend performance of the work for failure on the part of the contractor to correct conditions unsafe for workmen. The contract also provided that M-O would save harmless the state and all its representatives from all suits, actions or claims of any character based on any injuries sustained by any person in consequence of neglect in safeguarding the work.[1]

The reason that no action was taken is established in the record. As a matter of practice, it had been left to the individual project engineer on state jobs to determine how active a part he would play in exercising the powers granted him under highway contracts. In the instant case, the engineers chose to leave all responsibility for enforcing the safety requirements of the contract to the Department of Labor. This decision was based partly upon the engineers' understanding of the unarticulated "policy" of the Central District Highway Department. Mr. Burton Doucette, an employee of the Department of Labor, Industrial Safety Division, made periodic inspections at this bridge. Mr. Doucette was the only Department of Labor safety inspector operating in the Central District. He testified that he did not remember dis-

---

1. *See Manson-Osberg Co. v. State,* 552 P.2d 654, 657 (Alaska 1976).

covering any specific hazard requiring correction.

The trial court found that the project engineer knew or in the exercise of reasonable care would have discovered that a substantial amount of work was being done by ironworkers employed by M-O more than 40 feet off the ground without safety belts, safety harnesses, safety lines or safety nets underneath them. The trial court further found that the project engineer in the exercise of reasonable care should have known that Weber was working on a "float" 40 feet off the ground without such safety devices and that the float upon which he was working was not equipped with a guardrail as required by sec. 314–03 of the State of Alaska Construction Safety Code.

In addition, the trial court found that the state's project engineer was negligent in not discovering the absence of safety devices to prevent injury in the event of a fall and in failing to use reasonable care to cause M-O to remedy these dangers. Finally, the trial court held that given the power available to the project engineer, it was more probable than not that had he directed M-O to provide a guardrail, M-O would have done so. Had a guardrail, safety belt, safety harness or other safety device been provided, the trial court held that it was more likely than not that Weber would not have died.

From Territorial days, the common law not inconsistent with the Constitution and statutes has been the rule of decision in Alaska.[2] We have held that:

> The common law is not a rigid and arbitrary code, crystallized and immutable. Rather it is flexible and adapts itself to changing conditions. After all, the common law "is but the accumulated expressions of the various judicial tribunals in their efforts to ascertain what is right and just between individuals with respect to private disputes." What may be considered a just disposition of a dispute at one stage of history may not be the same at another stage, considering changing social, economic and other conditions of society.[3]

Under the facts of this case, I think that compelling reasons exist for imposing a common law duty on the state. State agencies are charged with obligations relative to occupational safety different from those imposed on other employers. The Prevention of Accident and Health Hazards Act establishes a legislative objective which lends support to the conclusion that there is a safety inspection duty on the part of state inspectors under these limited facts. AS 18.60.030(3) and (5) specify that the Department of Labor shall

> (3) work in cooperation with official and unofficial organizations and instrumentalities in the state which are interested in the promotion of safety so that possible resources can be marshalled and utilized to reduce the menace of accidental death and injury;
>
> . . . . . .
>
> (5) advise with the public agencies responsible for safeguarding the people against accidents, and especially with the Department of Public Works, the Department of Public Safety, the Department of Education, Department of Natural Resources, Department of Health and Social Services, and the heads or representatives of federal departments and agencies operating in the state particularly concerned with safety programs and accident prevention; . . ..

I would construe these provisions to refer to public agencies such as the Highway Department, which undertake contracts and activities having a substantial impact on safety. The statute requires cooperation by such agencies in marshalling and utilizing resources to reduce the menace of accidental death and injury. Requiring highway inspection personnel assigned to con-

---

2. AS 01.10.010.

3. *Howarth v. Pfeifer*, 443 P.2d 39, 44 (Alaska 1968) (footnotes omitted).

struction projects to enforce safety requirements, or at least to notify contractors of known violations is an obvious means of complying with the statutory mandate.

At the time of Mr. Weber's accident, AS 18.60.010 set forth the following findings by the Alaska Legislature:

(a) The legislature finds that preventable accidents are the leading cause of death in the state, that accidents cause nearly one-fourth of all deaths of the white race in the state and as much as 82 per cent of all deaths in certain age groups; that the proportion of accidental deaths to all deaths is three times as high in the state as in other parts of the United States in which intensive accident prevention campaigns are conducted; and that an unknown but proportionately as great a rate of nonfatal accidents is sustained in the state.

(b) For these reasons it is found and declared necessary to undertake a program to reduce the incidence of preventable accidents in the state.[4]

The Alaska occupational injury and death rate continues to be appallingly high.[5] The state has established safety codes and regulations and is responsible for enforcement of such codes.

Furtherance of these legislative policies and recognition of the urgent need for prevention of unnecessary accidental injuries and deaths support the imposition of a common law duty on the state under the circumstances involved here. Admittedly, the decision whether or not to inspect a particular project is discretionary.[6] Where, however, inspectors are assigned to a project, they cannot ignore infractions which become apparent in the course of their operational duties.[7] They have a duty to take reasonable action to assure

---

4. AS 18.60.010 now indicates a similar legislative concern:

(a) The legislature finds that personal injuries and illnesses arising out of work situations impose a substantial burden upon, and are a hindrance to, the people of the state in terms of loss of production, wage loss, medical expenses and disability compensation payments.

(b) For these reasons it is found and declared necessary to undertake a program to reduce the incidence of work-related accidents and health hazards in the state.

5. Survey results from the Alaska Department of Labor reported to the United States Department of Labor in 1974 as required by the Occupational Safety and Health Act revealed:

Almost 9,800 recordable occupational injuries and illnesses occurred in Alaska in 1974 in the private sector [excluding railroads]. On an average, this means 1 out of every 8 Alaskan employees experienced an occupational injury or illness during the year.

\* \* \* \* \*

During 1974 occupational injuries and illnesses caused an estimated loss of 44,638 workdays or the equivalent of a full years work for almost 200 employees. More than 50 percent of the lost workdays occurred in the construction and manufacturing industries.

6. Under the statute authorizing suits against the state, an action may not be brought based upon the

exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a state agency or an employee of the state, whether or not the discretion involved is abused.

AS 09.50.250(1).

7. *Adams v. State*, 555 P.2d 235, Opn. No. 1318 (Alaska 1976) (acting to ensure correction of and/or posting warnings of fire code violations discovered by the state during inspection of building); *Kaatz v. State*, 540 P.2d 1037 (Alaska 1975) (performing winter maintenance on state highways); *State v. I'Anson*, 529 P.2d 188 (Alaska 1974) (marking and striping highways over which state has direct control); *State v. Stanley*, 506 P.2d 1284 (Alaska 1973) (caring for property over which state assumed control as bailee); *State v. Abbott*, 498 P.2d 712 (Alaska 1972) (performing winter maintenance on state highways); *Lee v. State*, 490 P.2d 1206 (Alaska 1971) (physical rescue undertaken by police officer); *State v. Phillips*, 470 P.2d 266 (Alaska 1970) (repairing dangerously defective condition of highway over which state has control); *City of Fairbanks v. Schaible*, 375 P.2d 201 (Alaska 1962) (rescue efforts actively undertaken by city fire department).

correction of patent safety violations which involve serious risk of injury or death.

The rule of nonliability for negligence of independent contractors stems in part from the fact that it would be unduly burdensome for most general contractors to be charged with inspecting for safety code violations. Here, however, state inspectors were on the scene with actual or constructive knowledge of these code violations. Further, the trial court found:

> . . . the project engineer and his staff are quite capable of investigating and substantially improving contractor work practices. While the State witnesses denied any specific safety training they all expressed familiarity with State safety regulations and construction safety manuals. I am convinced that the project engineers (supervising architects, etc.) by virtue of their education and experience would with little expenditure in time and money exceed any expertise presently held by the Labor Department's safety inspectors.

Given their presence and expertise, it is not unduly burdensome to charge state inspectors assigned to a project with noting safety violations as well as violations of other contractual requirements.

I am not suggesting that the state re-establish its priorities or expand the scope of its inspections. Highway Department inspectors should not be required to ferret out all violations of safety regulations.[8] I would simply define a duty when the state elects to place inspectors on a state contract job site and when those inspectors should have knowledge of safety code or regulation violations.

It is true that the duty is different from that of non-state employers of contractors.[9] I would base this distinction on express legislative policies. If the legislature desires, it could either eliminate this duty of the state or expand it to other elements of society. I do not believe, however, that the legislature intended to permit such callous disregard of its own safety enactments as occurred in this case.

The imposition of this duty would not alter the state's present policies to assure compliance with state contractual specifications. The contention that state officials would abandon such programs merely because of potential liability is illusory, particularly as the financial impact of such liability would usually be shifted to the contractor by means of indemnity agreements.

While the financial impact of loss might be so shifted, placing responsibility on the

---

8. For example, in the situation involved in *Sloan v. Atlantic Richfield Co.*, 541 P.2d 717 (Alaska 1975), opinion on rehearing, 546 P.2d 568 (Alaska 1976), a moveable scaffold collapsed injuring an employee. There the state project engineers would not be chargeable with discovering that the scaffold was improperly constructed since, in the performance of their inspection duties, that fact would not normally come to their attention. Thus, in the absence of proof that the inspectors had actual knowledge of the code violations pertaining to the scaffold, there should be no duty imposed on the state.

9. The recently decided case of *Morris v. City of Soldotna*, 553 P.2d 474, Opn. No. 1296 (Alaska 1976), is distinguishable from the situation now before this court. In that case, we denied liability of the City which had en-

tered into a contract with the employer of an employee who was killed while painting in an enclosed area. Our holding there was limited to finding that Restatement (Second) of Torts (1965) §§ 416 and 427 did not apply to employees of independent contractors. Within the context of the common law duty I would impose on the state here, it should be noted, that the City of Soldotna is not subject to a state legislative provision as is the Department of Highways which, under AS 18.-60.030(3), is to "cooperate with" agencies such as the Department of Labor in areas of occupational safety. Here I would merely encourage the state to enforce, under very limited conditions, its own legislative concern and the state's own regulations concerning occupational safety. This situation was not presented to us in *Morris v. City of Soldotna, supra*.

state in such cases could only have a salutary effect. First and most important, charging state inspectors with a duty, even though the state could avoid ultimate loss, would result in prevention of accidents such as this one. Second, the state would indirectly feel the financial impact resulting from failure of compliance with its safety regulations in that contractors' insurance rates would rise to cover this additional liability and the state's cost would increase accordingly. Proper safety inspection would avoid such results.

There is a respectable line of authority imposing liability under the circumstances

of this case, based on theories of vicarious liability.[10] While I agree with the majority that vicarious liability should not apply to employers under these facts, the cases in Footnote 10 support the imposition of the more limited duty on the state suggested in this dissent.[11]

Under the facts of this case, the trial court specifically found that Weber's death could have been avoided by a simple order of the Department of Highways to correct occupational safety violations. These violations were known or should have been known to the state agency. The state project inspectors are now like the three

---

10. The jurisdictions of California, District of Columbia, Iowa, Michigan, Missouri, New Mexico, South Dakota and Tennessee have all held that a general contractor may be held liable to employees injured as a result of the negligence of an independent contractor where the work performed by the employee is inherently dangerous or where the general contractor's duty is otherwise nondelegable. *Lindler v. District of Columbia*, 164 U.S.App. D.C. 35, 502 F.2d 495, 498–500 (1974); *Hagberg v. City of Sioux Falls*, 281 F.Supp. 460, 466–68 (D.S.D.1968); *Pierce v. United States*, 142 F.Supp. 721, 728–29 (E.D.Tenn. 1955); *Van Arsdale v. Hollinger*, 68 Cal.2d 245, 66 Cal.Rptr. 20, 437 P.2d 508, 514 (1968); *Woolen v. Aerojet General Corp.*, 57 Cal.2d 407, 20 Cal.Rptr. 12, 369 P.2d 708, 711 (1962); *Ferrel v. Safway Steel Scaffolds*, 57 Cal.2d 651, 21 Cal.Rptr. 575, 371 P. 2d 311, 314 (1962); *Giarratano v. Weitz Co.*, 259 Iowa 1292, 147 N.W.2d 824, 833–34 (1967); *Vannoy v. City of Warren*, 15 Mich. App. 158, 166 N.W.2d 486, 489 (1968), *affirmed*, 15 Mich.App. 158, 194 N.W.2d 304 (1972); *Mallory v. Louisiana Pure Ice & Supply Co.*, 320 Mo. 95, 6 S.W.2d 617, 624–27 (1928); *Montanez v. Cass*, 89 N.M. 32, 546 P.2d 1189, 1194–95 (1975), *cert. granted* (1976); *International Harvester Co. v. Sartain*, 32 Tenn.App. 425, 222 S.W.2d 854, 865–68 (1948).

11. Another recognized line of authority arguably supporting imposition of liability is found in cases placing a duty to inspect upon insurers who retain a right to inspect the insured premises and negligently fail to properly perform such inspection services. *See Mays v. Liberty Mutual Ins. Co.*, 323 F.2d 174 (3rd Cir. 1963); *Mager v. United Hospitals of Newark*, 88 N.J.Super. 421, 212 A.

2d 664 (1965); *Nelson v. Union Wire Rope Corp.*, 31 Ill.2d 69, 199 N.E.2d 769 (1964); *Fabricius v. Montgomery Elevator Co.*, 254 Iowa 1319, 121 N.W.2d 361 (1963); *Smith v. American Employers' Ins. Co.*, 102 N.H. 530, 163 A.2d 564 (1960). *Contra, Mustapha v. Liberty Mutual Ins. Co.*, 387 F.2d 631 (1st Cir. 1967); *Williams v. United States Fidelity & Guaranty Co.*, 358 F.2d 799 (4th Cir. 1966); *Bartolotta v. United States*, 276 F. Supp. 66, 71–74 (D.Conn.1967); *Horne v. Security Mutual Casualty Co.*, 265 F.Supp. 379 (E.D.Ark.1967); *Donohue v. Md. Casualty Co.*, 248 F.Supp. 588 (D.Md.1965); *Kotarski v. Aetna Casualty & Surety Co.*, 244 F.Supp. 547, 555–56, *affirmed*, 372 F.2d 95 (6th Cir. 1967); which hold that the insurer is to be considered the "employer" for purposes of exclusive remedy under the Workmen's Compensation Act. *See also Stacy v. Aetna Casualty & Surety Co.*, 484 F.2d 289 (5th Cir. 1973); *Evans v. Liberty Mutual Ins. Co.*, 398 F.2d 665, 667 (3rd Cir. 1968); *Viducich v. Greater New York Mutual Ins. Co.*, 80 N.J.Super. 15, 192 A.2d 596 (1963); *DeJesus v. Liberty Mutual Ins. Co.*, 423 Pa. 198, 223 A.2d 849 (1966). These cases hold that while the insurer may be liable for failure to inspect, liability is premised upon a showing by the plaintiff that

> the [insured] in reliance on what the insurer undertakes to do lessens or omits its own safety measures and the insurer does not perform with due care what it has undertaken to do . . . .

*Stacy v. Aetna Casualty & Surety Co., supra*, 484 F.2d at 295. While the above cases are cited to express a principle relevant to the issues of this case, I do not mean to imply that I agree or disagree with the specific holdings of such cases.

monkeys who "see no evil, hear no evil, speak no evil" in that the majority opinion permits them to stand idly by without the slightest duty to notify the contractor of code violations or order corrective action, even though this would clearly prevent the loss of human life. It is not conceivable that the creation of such a small burden on the state could appreciably interfere with the other concerns of the state Department of Highways.

In light of the majority's decision, it is not necessary to discuss issues of contributory negligence or damages raised relating to pain and suffering. I would affirm the trial court's decision and impose liability on the state for breach of a common law duty.