# Constitutionality of Replacing Federal Tort Claims Act Liability with an Administrative Claims System

Congress may withdraw its waiver of sovereign immunity in the Federal Tort Claims Act for presently pending claims of radiation fallout victims, whether or not any administrative claims system is created as a substitute.

If it does not withdraw its waiver of sovereign immunity, Congress may substitute an administrative claims system for a judicial cause of action without offending due process, as long as the new remedy is fair and adequate when compared to the old one.

March 25, 1980

## MEMORANDUM OPINION FOR THE DEPUTY ASSISTANT ATTORNEY GENERAL, CIVIL DIVISION

This responds to your request for our opinion on the constitutionality of a possible statute substituting an administrative claims system for Federal Tort Claims Act (FTCA) causes of action for illness allegedly due to the effects of fallout from the Atmospheric Nuclear Weapons Testing Program at the Nevada Test Site. Although the exact contours of such legislation are now a matter of speculation, you have asked us to make some basic assumptions about the likely nature of the program. We will assume that the statute would have retroactive effect in the sense that it would abrogate presently existing causes of action under the Federal Tort Claims Act, 28 U.S.C. § 2680. We will also assume that the statute would define eligibility for compensation sufficiently broadly to include persons with a range of prospects of recovery in civil litigation, that it would set a level of benefits that in a particular case might be substantially less than tort recovery for a prevailing plaintiff, and that ordinary procedures for administrative adjudication would be used. We conclude that it is possible for Congress to draft a statute having these attributes that will be constitutional.[1]

### I. Congressional Withdrawal of Waivers of Sovereign Immunity

In the Federal Tort Claims Act of 1946, Congress waived the sovereign immunity of the United States for the torts of government employees, "under circumstances where the United States, if a private person,

---

[1] We do not consider here the validity of legislation abrogating any pending claims against government officers. Different considerations apply in that context, for example the constitutionality of removing the opportunity for a jury trial.

would be liable to a claimant in accordance with the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b); *See also* §§ 2674, 2680. Before that time, those with tort claims against the government were left to seek a remedy through a private bill in Congress (as were all claimants against the Government prior to the statute creating the Court of Claims, Act of Feb. 24, 1855, 10 Stat. 612). To what extent may Congress, having thus waived the sovereign immunity of the United States, reassert that immunity retroactively to defeat pending claims?

In *Lynch* v. *United States,* 292 U.S. 571 (1934), the Supreme Court provided a general exposition of congressional power to withdraw waivers of sovereign immunity. Beneficiaries of insurance policies issued under the War Risk Insurance Act sued for amounts due, alleging that repeal of the statutes governing their insurance deprived them of property without due process, in violation of the Fifth Amendment. It was clear to the Court that the insurance policies created vested property rights that could not be taken without just compensation. 292 U.S. at 579. Nevertheless, this did not mean that Congress was required to afford a judicial remedy:

> Contracts between individuals or corporations are impaired within the meaning of the Constitution whenever the right to enforce them by legal process is taken away or materially lessened. A different rule prevails in respect to contracts of sovereigns. Compare *Principality of Monaco* v. *Mississippi,* [292 U.S. 313 (1934)]. "The contracts between a Nation and an individual are only binding on the conscience of the sovereign and have no pretensions to compulsive force. They confer no right of action independent of the sovereign will" [quoting The Federalist No. 81 (Hamilton)]. The rule that the United States may not be sued without its consent is all embracing.

> \*     \*     \*     \*     \*

> Although consent to sue was thus given when the policy issued, Congress retained power to withdraw the consent at any time. For consent to sue the United States is a privilege accorded; not the grant of a property right protected by the Fifth Amendment. The consent may be withdrawn, although given after much deliberation and for a pecuniary consideration. *DeGroot* v. *United States,* 5 Wall. 419, 432. . . . The sovereign's immunity from suit exists whatever the character of the proceeding or the source of the right sought to be enforced. It applies alike to causes of action arising under acts of Congress, *DeGroot* v. *United States,* 5 Wall. 419, 431; *United States* v. *Babcock,* 250 U.S. 328, 331; and to those arising from

517

some violation of rights conferred upon the citizen by the Constitution. *Schillinger* v. *United States*, 155 U.S. 163, 166, 168. The character of the cause of action—the fact that it is in contract as distinguished from tort—may be important in determining (as under the Tucker Act) whether consent to sue was given. Otherwise, it is of no significance. For immunity from suit is an attribute of sovereignty which may not be bartered away.

Mere withdrawal of consent to sue on policies for yearly renewable term insurance would not imply repudiation. When the United States creates rights in individuals against itself, it is under no obligation to provide a remedy through the courts. *United States* v. *Babcock*, 250 U.S. 328, 331. It may limit the individual to administrative remedies. *Tutun* v. *United States*, 270 U.S. 568, 576. And withdrawal of all remedy, administrative as well as legal, would not necessarily imply repudiation. So long as the contractual obligation is recognized, Congress may direct its fulfilment without the interposition of either a court or an administrative tribunal.

*Id.* at 580–82 (footnotes omitted). The Court went on to determine that Congress' repeal of the insurance statutes did not "intend to preserve the right and merely withdraw consent to sue the United States." *Id.* at 583 (footnote omitted). Accordingly, the Court held that the repeal of the insurance statutes was unconstitutional.

It is clear that in *Lynch* the Court thought that, had Congress merely abrogated the claimants' remedy by withdrawing consent to sue, the effect would have been to remit them to private bills for redress of the taking of their property. To the same effect is *Perry* v. *United States*, 294 U.S. 330, 331 (1935), in which the Court held that the Government could not rescind obligations for payment of its bonds in gold, because the power of Congress "to borrow Money on the credit of the United States" (Article 1, § 8) creates the power to enter binding obligations. The Court remarked, however:

The fact that the United States may not be sued without its consent is a matter of procedure which does not affect the legal and binding character of its contracts. While the Congress is under no duty to provide remedies through the courts, the contractual obligation still exists and, despite infirmities of procedure, remains binding upon the conscience of the sovereign. *Lynch* v. *United States, supra*, pp. 580, 582.

294 U.S. at 354.

A more recent reaffirmation of *Lynch* is found in *Maricopa County* v. *Valley National Bank,* 318 U.S. 357, 362 (1943). The Court held that Congress, having granted states the right to tax a federal instrumentality, could retroactively withdraw that consent despite the fact that states had acquired liens in the interim. It brushed aside claims that a Fifth Amendment violation had occurred with the observation that the states could only enforce any rights they had acquired through a suit against the United States, and "[n]o such suit may be maintained without the consent of the United States. Such consent, though previously granted, has now been withdrawn. And the power to withdraw the privilege of suing the United States or its instrumentalities knows no limitations." *Lynch* v. *United States,* 292 U.S. 571, 581–582, and cases cited.

As *Maricopa County* recognized, *Lynch* has been decided against a background of earlier cases in much the same vein. Illustrative is *District of Columbia* v. *Eslin,* 183 U.S. 62 (1901). Congress had enacted a statute granting jurisdiction to the Court of Claims over certain claims involving public works in the District of Columbia. Suits under this act were pursued to judgment, but before the judgments were paid Congress repealed the statute, explicitly providing that "proceedings pending shall be vacated, and no judgment heretofore rendered in pursuance of such act shall be paid." 183 U.S. at 64, citing 29 Stat. 665, 669. The Court, asked to review the judgments of the Court of Claims, dismissed the appeal for want of jurisdiction, on grounds that a Supreme Court declaration of the rights of the parties would now be advisory. The Court stated:

> It was an act of grace upon the part of the United States
> to provide for the payment by the Secretary of the Treas-
> ury of the amount of any final judgment rendered under
> that act. And when Congress by the act of 1897 directed
> the Secretary not to pay any judgment based on the act of
> 1895, that officer could not be compelled by the process
> of any court to make such payment in violation of the act
> of 1897. A proceeding against the Secretary having that
> object in view would, in legal effect, be a suit against the
> United States; and such a suit could not be entertained by
> any judicial tribunal without the consent of the Govern-
> ment.

183 U.S. at 65.

If this line of Supreme Court cases is still good law, Congress should be able to withdraw the FTCA's waiver of sovereign immunity for pending claims of fallout victims, whether or not any administrative claims system is created as a substitute. In view of the early practice of leaving all claimants against the Government to seek relief from Congress,

519

followed for over a half-century of this nation's existence, it is hard to dispute the Court's conclusion that there is no constitutional right to a judicial remedy. Indeed, FTCA claims would seem to be *a fortiori* from *Lynch* and *Perry*, since tort claims do not involve vested rights protected against substantive interference by Congress, as did that contract rights considered in those two cases. Thus, Congress could simply amend the FTCA to add another exception to 28 U.S.C. § 2680, for present and future claims arising from the activities of the United States in conducting nuclear weapons tests at the Nevada Test Site. For a number of reasons, however, we think it may be imprudent to rest exclusively on the *Lynch* line of cases. First, the extensive dicta in *Lynch* itself occurred in a case in which the Court was *overturning* a congressional attempt to repeal the insurance statutes in question, as a violation of the just compensation requirement of the Fifth Amendment. Second, neither in *Lynch* itself nor in any later case has the Court actually countenanced so harsh an action as the retroactive withdrawal of an individual's tort cause of action with little or no substitute remedy.

Moreover, in recent years the Supreme Court has substantially expanded its definition of interests falling within the "property" that is protected by the due process clause, including statutory entitlements to many kinds of governmental benefits. *See, e.g., Goldberg* v. *Kelly,* 397 U.S. 254, 262 and n.8 (1970). This development may undermine *Lynch's* characterization of a cause of action against the Government as a "privilege." *See de Rodulfa* v. *United States,* 461 F.2d 1240, 1258 (D.C. Cir.), *cert. denied,* 409 U.S. 949 (1972). It can be argued that causes of action resemble other government benefits in that even if there is no initial right to have them, once they are conferred they may not be withdrawn arbitrarily.

Still, it must be recognized that the Court has yet to hold or even suggest that withdrawal of a waiver of sovereign immunity is subject to due process constraints. The issue of the effect of *Goldberg* and its progeny on *Lynch* is an open one—accordingly, we cannot exclude the possibility that abrogation of pending causes of action might receive *some* scrutiny by the courts, as does other retroactive governmental action.

In addition, a leading sovereign immunity case has recognized a "constitutional exception to the doctrine of sovereign immunity" that allows the maintenance of a suit to contest an alleged taking of real property by the Government without just compensation. *Larson* v. *Domestic & Foreign Commerce Corp.,* 337 U.S. 682, 696 (1949), citing *United States* v. *Lee,* 106 U.S. 196 (1882). This "exception" is inconsistent with *Lynch's* dictum that there is no right to a judicial remedy even for claims of constitutional origin. Thus, if any of the fallout claimants

can successfully characterize their injuries as takings, it might be possible for them to escape the bar of the *Lynch* line of cases.

Finally, it may be that in substituting a fallout claims system for existing causes of action, Congress will be unwilling explicitly to reassert the bar of sovereign immunity. In recent years, Congress has generally expanded, not contracted its waivers of sovereign immunity. *See, e.g.,* Pub. L. No. 93-253, 88 Stat. 50, amending the FTCA to allow recovery for torts of law enforcement officers, 28 U.S.C. § 2680(h). And a reassertion of immunity against the fallout plaintiffs, even with a substitute claims system, could have an appearance of harshness that Congress would avoid if possible. If Congress were simply to create a claims system and to provide for its exclusiveness as a remedy without adding a new exception to the FTCA, the courts might conclude that Congress had merely altered the remedy against the United States, without reasserting sovereign immunity. The likelihood of such a result is suggested by the *Lynch* Court's unwillingness to treat an ambiguous statute as a reassertion of soverign immunity. The consequence would be to subject the statute to due process review, a prospect to which we now turn.

## II. Due Process and Legislative Alteration of Causes of Action

Shortly after *Lynch* was decided, the Supreme Court avoided reaching due process objections to a statute retroactively substituting an administrative claims system for a cause of action, by determining the new remedy to be "fair and adequate." In *Anniston Mfg. Co.* v. *Davis,* 301 U.S. 337 (1937), the plaintiff filed a lawsuit against the Collector of Internal Revenue to obtain a refund of an allegedly illegal tax. Congress then substituted an exclusive administrative remedy, which was apparently designed to afford the same measure of recovery as the abrogated cause of action. 301 U.S. at 345, 351. The Government argued that no decision on Congress' power to withdraw suit against the Collector and the Government was necessary since the new remedy was "fair and adequate." [2] The Supreme Court agreed and inquired into the sufficiency of the statute's provisions for administrative adjudicative procedures and judicial review. It found them adequate to determine pertinent questions of fact and law. 301 U.S. at 341-43. Thus *Anniston* does not provide support for the validity of legislative substitution of limited administrative benefits for the full measure of tort compensation. It does suggest that a claims system should employ well-established techniques for administrative adjudication and subsequent judicial

---

[2] Two reasons may account for the Court's apparent perception of a need to avoid constitutional issues in *Anniston.* The first is the "constitutional exception to sovereign immunity" in taking cases, discussed in text above. The second is that the statute abrogated suits against both the Government and the officer involved.

review, such as those in the Administrative Procedure Act, 5 U.S.C. §§ 556–557, 701–706.

More recently, in *Duke Power Co.* v. *Carolina Environmental Study Group, Inc.*, 438 U.S. 59 (1978), the Court upheld against a due process challenge the Price-Anderson Act, 42 U.S.C. § 2210, which limits the liability of the nuclear power plant operators for the consequences of accidents. The Court viewed the liability limitation as an ordinary legislative balancing of economic interests, and accorded it standard rationality review, which it passed readily. Of particular interest here is the Court's response to the plaintiff's argument that the liability limitation offended due process by failing to provide those injured by a nuclear accident with a satisfactory *quid pro quo* for the common law rights of recovery which the Act restricted. The Court concluded that the Act provided a "reasonably just substitute" for the tort law remedies it replaced. 438 U.S. at 93. In support of the fairness of the arrangement, the Court cited the assurance of a $560 million fund for recovery, in place of the uncertain resources of private defendants, and the Act's requirement that utilities waive state tort law defenses, which eliminated requirements for proof of fault and accompanying delay and uncertainty in litigation. The Court seemed to think that the Act placed prospective plaintiffs in at least as favorable a position as they would have occupied under the common law. Thus *Duke Power,* like *Anniston,* provides little support for the validity of a system that materially disadvantages claimants. The Court concluded:

> In the course of adjudicating a similar challenge to the Workmen's Compensation Act in *New York Central R. Co.* v. *White,* 243 U.S. at 201, the Court observed that the Due Process Clause of the Fourteenth Amendment was not violated simply because an injured party would not be able to recover as much under the Act as before its enactment. "[H]e is entitled to moderate compensation in all cases of injury, and has a certain and speedy remedy without the difficulty and expense of establishing negligence or proving the amount of the damages." The logic of *New York Central* would seem to apply with renewed force in the context of this challenge to the Price-Anderson Act. The Price-Anderson Act not only provides a reasonable, prompt, and equitable mechanism for compensating victims of a catastrophic nuclear incident, it also guarantees a level of net compensation generally exceeding that recoverable in private litigation. . . . This panoply of remedies and guarantees is at the least a reasonably just substitute for the common-law rights replaced by the Price-Anderson Act. Nothing more is required by the Due Process Clause.

438 U.S. at 92–93.

In *Duke Power,* the Court was dealing with prospective legislation—no claims for a nuclear accident were then outstanding. The legislation upheld in *New York Central* appears to have been prospective also. The Court's approach to the validity of retroactive legislation under the Due Process Clauses of the Fifth and Fourteenth Amendments is, however, not greatly different from that of *Duke Power,* even though substantial new burdens may be imposed. The ordinary standard is that due process "generally does not prohibit retrospective civil legislation, unless the consequences are particularly 'harsh and oppressive',," *United States Trust Co. of New York* v. *New Jersey,* 431 U.S. 1, 17 n.13 (1977), citing *Welsh* v. *Henry,* 305 U.S. 134, 147 (1938) and *Usery* v. *Turner Elkhorn Mining Co.,* 428 U.S. 1, 14–20 (1976). In *Usery,* the Court upheld the Black Lung Benefits Act, although it required mine operators to pay workman's compensation benefits to miners on a retroactive basis. The Court said:

> But our cases are clear that legislation readjusting rights and burdens is not unlawful solely because it upsets otherwise settled expectations. . . . This is true even though the effect of the legislation is to impose a new duty or liability based on past acts.

428 U.S. at 16.

In *Usery,* the Court thought that retroactive imposition of an obligation to pay compensation was a rational application of the enterprise liability principles of modern tort analysis, according to which a business may be required to absorb the cost of the injuries it causes, regardless of the presence of fault in the traditional sense. The Court remarked that whether a broader or narrower cost-spreading scheme would be better did not rise to the level of a constitutional issue. 428 U.S. at 19.

*Usery* does not necessarily represent the high-water mark of judicial willingness to allow retroactive legislative alteration of compensation rights against private parties. The courts of appeals have upheld legislative abrogation of existing causes of action with no countervailing benefit—at least where the causes of action were themselves in the nature of windfalls, due to surprising judicial interpretation of earlier statutory provisions.[3] Both *Usery* and these court of appeals decisions seem to rest on notions of fairness—it would be unsound to extend them to the arbitrary alteration of compensation rights.

---

[3] *Battaglia* v. *General Motors Corp.,* 169 F.2d 254 (2d Cir. 1948) (Portal-to-Portal Act); *Seese* v. *Bethlehem Steel Co.,* 168 F.2d 58 (4th Cir. 1948) (Portal-to-Portal Act). *De Rodulfa* v. *United States,* 461 F.2d 1240, 1250 (D.C. Cir.), *cert. denied,* 409 U.S. 949 (1972), cites cases for the general rule that a change in governing law may be retroactively applied to pending litigation. *E.g., United States* v. *Schooner Peggy,* 5 U.S. 103 (1 Cranch) (1801) (Marshall, J.). Indeed, such a change may even affect rights incident to final judgments. *See Fleming* v. *Rhodes,* 331 U.S. 100 (1947), upholding requirements for administrative approval of suits to enforce judgments granting possession to property.

### III. The Government's Adjustment of Its Own Liabilities—Analogies from the Contract Clause

What standard of review should apply to a government's adjustment of its own preexisting obligations? In *Usery* and *Duke Power,* the Court applied rationality scrutiny to federal statutes adjusting rights and burdens among private parties. (In *Duke Power,* although federal indemnity was a large part of the liability pool provided by the Price-Anderson Act, the Government was not reducing its own prior liability.) In litigation under the Contract Clause (art. I, § 10), which only applies to the states, the Court has suggested that a more stringent standard applies to a government's attempt to modify its own obligations. In *United States Trust Co. of New York* v. *New Jersey, supra,* the Court invalidated an attempt by New Jersey to modify a contract with some of its bondholders. The state had eliminated an important security provision for the bondholders, without granting them a countervailing compensation. The Court remarked:

> The Contract Clause is not an absolute bar to subsequent modification of a State's own financial obligations. As with laws impairing the obligations of private contracts, an impairment may be constitutional if it is reasonable and necessary to serve an important public purpose. In applying this standard, however, complete deference to a legislative assessment of reasonableness and necessity is not appropriate because the State's self-interest is at stake.

431 U.S. at 25–26 (footnote omitted).

In general, federal cases under the Due Process Clause closely parallel the Contract Clause cases. This suggests that if the Court abandons the view of sovereign immunity it articulated in *Lynch,* it is likely to employ the higher level of scrutiny articulated in *United States Trust Co.* when it reviews the Government's adjustment of its own obligations—especially when the Government disadvantages private parties retroactively with no compensating benefits. That does not mean that such heightened scrutiny will necessarily apply in the case at hand. Since there is presently genuine uncertainty regarding the ultimate cost to the Government of pending FTCA litigation, it is not clear that the substitution of a claims system will be seen principally as an "economy" measure.

It should be possible to draft a valid statute creating an exclusive administrative claims system, even if the test of *United States Trust Co.* is applied. In that case, the Court identified alternative means to the state's end, and emphasized the direct invasion of reliance that typically attends a Contract Clause case. The latter is not present here; as for the former, if the Government's purpose is to provide a broader allocation of benefits than the FTCA would produce, the only alternative would

be to establish a nonexclusive administrative claims system, leaving plaintiffs the option to pursue FTCA litigation. Although arguments for governmental economizing were discounted by the *United States Trust Co.* Court, that was probably because the state gave the bondholders no countervailing benefit. That need not be true here; the need to conserve limited public resources by making the administrative claims system exclusive should be given enough weight to uphold the statute, if it accords claimants sufficient advantages to ensure the fairness of the overall result.

## IV. Application of Due Process Analysis to an Administrative Claims System for Fallout Victims

Assuming that due process applies in the case before us, the question therefore seems to be whether an administrative claims system can provide a "reasonably just substitute" (*Duke Power*) for existing causes of action, or a "reasonable and necessary" means to "an important public purpose" (*United States Trust Co.*). For a statute to satisfy even the more stringent of these tests, it should only be necessary that it grant claimants substantial advantages as a *quid pro quo* for their causes of action. A number of substantial hurdles presently stand in the way of recovery by private plaintiffs under the Federal Tort Claims Act. First, it is not clear that plaintiffs will be able to establish the Government's liability. The "discretionary function" exception of 28 U.S.C. § 2680(a) will preclude liability for all planning decisions involved in the tests, as opposed to operational ones. *Dalehite* v. *United States,* 346 U.S. 15 (1953). It has been held, however, that negligent failure to warn those in the path of fallout is actionable. *Bulloch* v. *United States,* 133 F. Supp. 885, 888 (D. Utah, 1955); *but see Bartholomae Corp.* v. *United States,* 135 F. Supp. 651 (S.D. Cal., 1955) (no liability for damage from atomic blast; duty to warn not discussed). Second, many plaintiffs may be unable to prove that fallout caused their illness. Estimating the dosage received by a particular individual and linking that to the etiology of a particular cancer is, under all current assessments, often very difficult. Third, some claims may be barred by the statute of limitations, 28 U.S.C § 2401(b). (It has been held that the two-year period runs from the time a radiogenic illness is discovered or should have been discovered, and not from the date of exposure. *Kuhne* v. *United States,* 267 F. Supp. 649 (E.D. Tenn., 1967).) In any event, the litigation involved is sure to be time-consuming, considering the technical complexity of much of the proof. Still, it can be argued that ultimate recovery to the successful plaintiff in a tort action would be in a much higher amount than under an administrative claims system, perhaps impelling the Government to enter favorable settlements of some claims.

The particular structure of a claims system can help to ensure its constitutional validity. First, eligibility criteria for filing claims can reflect probabilities of both serious initial exposure levels to fallout and the correlation of particular cancers with exposure to radiation. To the extent that these criteria would allow compensation to some persons whose showing of causation would not likely satisfy a trier of fact in litigation, the Government will confer an advantage on claimants as a class. Moreover, the program would be responding as precisely as possible to increased risks that we know the affected population has encountered, although we cannot be sure exactly which persons suffered the greatest exposure or exactly which cancers are the result of that exposure. Thus there is evident fairness in a set of eligibility criteria based on probabilities.

With regard to amounts of compensation, the larger the pool of claimants the less feasible it becomes to approach full tort compensation. But insofar as compensation would duplicate that recovery, by providing for medical expenses and perhaps some income support, claimants are not disadvantaged. If recovery for pain and suffering is the major element of tort recovery to be eliminated, the statute will resemble other government compensation programs in that respect. It is easier to justify a claims program that is on an entitlement basis, rather than one payable from a limited fund.[4]

The administrative procedures used to adjudicate claims are particularly important, because they can eliminate procedural features of litigation that would proably defeat private claims, such as the pertinent tort burdens of proof.[5] As we commented above, the Administrative Procedures Act provides a general structure for both adjudicative procedure and judicial review.

### V. Conclusion

From the foregoing, two central conclusions emerge. First, if the primary goal of this proposed legislation is to minimize the risk of successful constitutional challenge, the preferable course will be for this bill plainly to indicate that it is Congress' intent to rescind its waiver of sovereign immunity for this class of cases. *Lynch* suggests that this course presents no constitutional question—at least in terms of the judicial reviewability of the action—and despite considerable development in the analogous areas of the law discussed above, we know of no direct precedent that would call into question the broad language of that Supreme Court case. Second, even if the bill is reviewed under due

---

[4] If a limited fund is established, part can be reserved for illness that is still latent. This is a feature of the Price-Anderson Act, 42 U.S.C. § 2210(o).

[5] Administrative procedures often use flexible techniques not available to courts to achieve such results. *E.g.*, in *Usery*, the Act provided for rebuttable presumptions favoring claimants, for example that deaths occurring in prior years had been due to black lung disease in stated circumstances.

process rationales discussed above, there is good reason to conclude that it will comfortably survive attack so long as the eligibility criteria are reasonably flexible, the amount of compensation reasonably generous, and the administrative process consistent with ordinary procedure for adjudicating claims. We would be pleased to review further any particular proposal.

LARRY A. HAMMOND
*Deputy Assistant Attorney General*
*Office of Legal Counsel*